# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

ROBERT HOPKINS, III,

*Plaintiff,*

v.

DEPARTMENT OF DEFENSE,

*Defendant.*

No. 3:22-CV-00706-E

## DEFENDANT'S BRIEF IN SUPPORT OF
## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

JOHN T. LEWIS (TX Bar No. 24095074)
LISA NEWMAN (TX Bar No. 24107878)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 353-0533
Fax: (202) 616-8460
E-mail: john.t.lewis.iii@usdoj.gov

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................... iii

Introduction ....................................................................................... 1

Background........................................................................................ 4

I.      Statutory and Regulatory Background ......................................... 4

II.     Factual Background ..................................................................... 7

III.    This Lawsuit ...............................................................................11

Standard of Review...........................................................................12

Argument..........................................................................................13

I.      Dr. Hopkins's challenges to the procedures used to review his manuscripts are non-justiciable.........................................................................13

        A.      Dr. Hopkins's procedural claims are moot. .....................14

        B.      Dr. Hopkins lacks standing to assert his procedural claims and/or such challenges are unripe...........................................................17

II.     Dr. Hopkins's procedural claims fail on the merits. ....................21

        A.      The Department reasonably processed Dr. Hopkins's manuscripts. ..22

        B.      Dr. Hopkins's First Amendment claims fail......................25

                1.      The Department did not violate Dr. Hopkins's First Amendment rights by requiring him to comply with the prepublication review process.................................25

                2.      The Department did not unconstitutionally retaliate against Dr. Hopkins. ...............................................................30

                3.      Dr. Hopkins's counsel is not entitled to access classified information. ................................................................33

        C.      Dr. Hopkins's Administrative Procedure Act claims fail...................35

III.    Dr. Hopkins's challenges to the Department's prepublication decisions fail because the redacted information is properly classified..............................39

        A.      The Department's redaction determinations in this case are entitled to deference. ........................................................................41

B.    The Department properly redacted classified information. ................45

     1.    Executive Order 13,526 ...........................................46

         a.    An original classification authority classified the information. .................................................46

         b.    The information is owned by, produced by or for, or is under the control of the government............................48

         c.    The redacted classified information falls within section 1.4(c) of the Executive Order and disclosure could reasonably be expected to cause serious harm to national security. .......................................................49

     2.    Atomic Energy Act ................................................52

Conclusion.............................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&R Engineering & Testing, Inc. v. Scott,*
  72 F.4th 685 (5th Cir. 2023) .............................................................15

*Afshar v. Dept of State,*
  702 F.2d 1125 (D.C. Cir. 1983) .........................................................47

*Alfred A. Knopf, Inc. v. Colby,*
  509 F.2d 1362 (4th Cir. 1975) .......................................26, 29, 30, 48

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ...........................................................................13

*Berntsen v. CIA,*
  618 F. Supp. 2d 27 (D.D.C. 2009) .....................................................44

*Boening v. CIA,*
  579 F. Supp. 2d 166 (D.D.C. 2008) ...................................................16

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ...........................................................................16

*CIA v. Sims,*
  471 U.S. 159 (1985) .....................................................................34, 44

*Citizens to Preserve Overton Park v. Volpe,*
  401 U.S. 402 (1971) .....................................................................36, 38

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...........................................................................18

*Clifford v. Pena,*
  77 F.3d 1414 (D.C. Cir. 1996) ...........................................................22

*Colson v. Grohman,*
  174 F.3d 498 (5th Cir. 1999) .............................................................32

*Cripps v. La. Dep't of Agric. & Forestry,*
  819 F.3d 221 (5th Cir. 2016) .............................................................32

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
  704 F.3d 413 (5th Cir 2013) ...............................................................15

*Ctr. for Nat'l Sec. Studies v. DOJ*,
  331 F.3d 918 (D.C. Cir. 2003).......................................38, 41, 42, 44

*DeOtte v. Nevada*,
  20 F.4th 1055 (5th Cir. 2021) ...........................................................15

*Dep't of the Navy v. Egan*,
  484 U.S. 518 (1988) ...............................................................*passim*

*Doe v. Doe Agency*,
  608 F. Supp. 2d 68 (D.D.C. 2009) .............................................16, 20

*E.T. v. Paxton*,
  41 F.4th 709 (5th Cir. 2022) .............................................................18

*Edgar v. Haines*,
  2 F.4th 298 (4th Cir. 2021) ...........................................26, 28, 29, 30

*Ermuraki v. Renaud*,
  987 F.3d 384 (5th Cir. 2021) .............................................................15

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..........................................................................36

*FCC v. Schreiber*,
  381 U.S. 279 (1965) ..........................................................................38

*Fitzgibbon v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990)......................................................34, 48

*Freedom From Religion Found., Inc. v. Abbott*,
  58 F.4th 824 (5th Cir. 2023) .............................................................15

*Frugone v. CIA*,
  169 F.3d 772 (D.C. Cir. 1999).........................................................42

*Gardels v. CIA*,
  689 F.2d 1100 (D.C. Cir. 1982)........................................................43

*Goodrich v. United States*,
  3 F.4th 776 (5th Cir. 2021) ...............................................................13

*Ground Zero Ctr. for Nonviolent Action v. U.S. Dep't of the Navy*,
  918 F. Supp. 2d 1132 (W.D. Wash. 2013) .......................................51

*Haig v. Agee*,
  453 U.S. 280 (1981) ........................................................................... 4

*Halkin v. Helms*,
  598 F.2d 1 (D.C. Cir. 1978)........................................................41, 43

*Halperin v. CIA*,
  629 F.2d 144 (D.C. Cir. 1980) ....................................................43, 50

*Hinkley v. Envoy Air, Inc.*,
  968 F.3d 544 (5th Cir. 2020) ......................................................15, 16

*Holy Land Found. for Relief & Dev.*,
  333 F.3d 156 (D.C. Cir. 2003).........................................................42

*Huddleston v. FBI*,
  2022 WL 4593084 (E.D. Tex. 2022) ..........................................13, 45

*Keenan v. Tejeda*,
  290 F.3d 252 (5th Cir. 2002) ......................................................31, 32

*Klaus v. Blake*,
  428 F. Supp. 37 (D.D.C. 1976)........................................................50

*Knight v. CIA*,
  872 F.2d 660 (5th Cir. 1989) ...........................................................43

*Krikorian v. Dep't of State*,
  984 F.2d 461 (D.C. Cir. 1993).........................................................45

*La. Env't Action Network v. EPA*,
  382 F.3d 575 (5th Cir. 2004) ...........................................................15

*Larson v. Dep't of State*,
  565 F.3d 857 (D.C. Cir. 2009)....................................................13, 40

*Laufer v. Mann Hosp., L.L.C.*,
    996 F.3d 269 (5th Cir. 2021) ..............................................................................12

*Liner v. Jafco, Inc.*,
    375 U.S. 301 (1964) ...........................................................................................15

*Loomis v. U.S. Dep't of Energy*,
    1999 WL 33541935 (N.D.N.Y. 1999) ................................................................51

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................................18, 19

*McGehee v. Casey*,
    718 F.2d 1137 (D.C. Cir. 1983) .................................................................*passim*

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ............................................................................................20

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*,
    602 F.3d 687 (5th Cir. 2010) ..............................................................................36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..............................................................................................35

*North Carolina v. Rice*,
    404 U.S. 244 (1971) ............................................................................................21

*Olivares v. TSA*,
    819 F.3d 454 (D.C. Cir. 2016) ...........................................................................22

*Pierce v. Texas Dep't of Crim. J.*,
    37 F.3d 1146 (5th Cir. 1994) ..............................................................................32

*Preiser v. Newkirk*,
    422 U.S. 395 (1975) ............................................................................................21

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ..............................................................................13

*Rosedale Missionary Baptist Church v. New Orleans*,
    641 F.3d 86 (5th Cir. 2011) ................................................................................20

*Shaffer v. DIA*,
102 F. Supp. 3d 1 (D.D.C. 2015) ...............................................................*passim*

*Shields v. Norton*,
289 F.3d 832 (5th Cir. 2002) ..............................................................20

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*,
968 F.3d 419 (5th Cir. 2020) ..............................................................18

*Sierra Club v. United States Dep't of Interior*,
990 F.3d 909 (5th Cir. 2021) ..............................................................36

*Simmons v. DOJ*,
796 F.2d 709 (4th Cir. 1986) ..............................................................41

*Snepp v. United States*,
444 U.S. 507 (1980) ...................................................................26, 27, 28

*Stillman v. CIA*,
319 F.3d 546 (D.C. Cir. 2003) ......................................................27, 39, 40, 44

*Stillman v. CIA*,
517 F. Supp. 2d 32 (D.D.C. 2007) ..........................................................16, 27

*Taylor v. Dep't of the Army*,
684 F.2d 99 (D.C. Cir. 1982) ..............................................................41

*Texas v. United States*,
523 U.S. 296 (1998) ...................................................................20

*Thole v. U.S. Bank N.A.*,
140 S. Ct. 1615 (2020).................................................................18

*Thomas v. Union Carbide Agric. Prods. Co.*,
473 U.S. 568 (1985) ...................................................................20

*Toy v. Holder*,
714 F.3d 881 (5th Cir. 2013) ..............................................................34, 42

*U.S. Navy SEALs 1-26 v. Biden*,
72 F.4th 666 (5th Cir. 2023) ..............................................................16

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ...................................................................................42

*United States v. Marchetti*,
  466 F.2d 1309 (4th Cir. 1972) ...........................................................26, 43

*United States v. Nixon*,
  418 U.S. 683 (1974) ...................................................................................41

*United States v. Snepp*,
  595 F.2d 926 (4th Cir. 1979) .....................................................................28

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ...................................................................................18

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ...................................................................................38

*Watkins v. Three Admin. Remedy Coordinators of Bureau of Prisons*,
  998 F.3d 682 (5th Cir. 2021) .....................................................................17

*Weinberger v. Cath. Action of Hawaii/Peace Educ. Project*,
  454 U.S. 139 (1981) ...................................................................................51

*Wilson v. CIA*,
  586 F.3d 171 (2d Cir. 2009) ...............................................................26, 27

*Wilson v. McConnell*,
  501 F. Supp. 2d 545 (S.D.N.Y. 2007), *aff'd sub nom.*
  *Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009)...........................................26

*Zummer v. Sallet*,
  37 F.4th 996 (5th Cir. 2022) ......................................................................34

**Statutes, Rules, and Regulations**

5 U.S.C. § 702 .................................................................................................16

42 U.S.C.
  § 2014.......................................................................................................4, 52
  § 2162...........................................................................................................53

10 C.F.R.
  § 1045.30....................................................................................53
  § 1045.45....................................................................................53
  § 1045.70....................................................................................52
  § 1045.125..................................................................................54
  § 1045.130..................................................................................54

*Classified National Security Information*,
  Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) .....................*passim*

**Other Authorities**

13B Charles Alan Wright et al., Fed. Prac. & Proc. § 3533 (3d ed. 2020).............15

Department of Defense Instructions ......................................................6, 24, 37, 53

Standard Form 312,
  https://perma.cc/CBK3-PKPR ....................................................................5, 6

**INTRODUCTION**

Plaintiff Dr. Robert Hopkins, III is a former Air Force Captain who was entrusted with access to classified information during his service. Dr. Hopkins accepted a position of special trust and confidence involving the national security of the United States—including access to highly sensitive and classified information. To do so, Dr. Hopkins voluntarily and knowingly signed a nondisclosure agreement, under which he accepted a lifelong contractual obligation to protect covered information from disclosure and to submit for prepublication review certain information that he wished to publicly disclose. This prepublication review process allows the Department of Defense an opportunity to review a draft publication to ensure that its disclosure would not reveal classified information and imperil national security.

Dr. Hopkins filed this lawsuit in March 2022 to compel the Department to process several of his manuscripts more quickly. Specifically, Dr. Hopkins asserted that the United States Secretary of the Air Force Office of Public Affairs ("SAF/PA") improperly referred his publications to the Defense Office of Prepublication and Security Review ("DOPSR"), that DOPSR improperly closed its review after his counsel failed to provide Dr. Hopkins's contact information, and that both offices improperly declined to communicate directly with his counsel, who lacks a security clearance, regarding the contents of those

1

publications. He also alleged that certain of SAF/PA and DOPSR's purported prepublication review policies are unlawful as a general matter.

All of these procedural claims are now moot. DOPSR has completed its review of all of the publications identified in the Complaint. To the extent Dr. Hopkins intends to challenge SAF/PA or DOPSR's procedures as they might apply to hypothetical future publications, he lacks standing to do so and/or those claims are unripe until he actually submits another publication for review. In short, none of these claims are justiciable.

Even if the Court had jurisdiction to review Dr. Hopkins's procedural claims, they would fail on the merits. SAF/PA referred two of Dr. Hopkins's manuscripts to DOPSR because they contained subject matter of interest to other Department components. Then, when DOPSR noticed that Dr. Hopkins's counsel repeatedly submitted manuscripts containing classified information—to which counsel could not lawfully have access—DOPSR asked counsel to provide Dr. Hopkins's contact information so that DOPSR could communicate with him directly. When counsel refused to do so, DOPSR temporarily closed its review of Dr. Hopkins's manuscripts. Nevertheless, Dr. Hopkins remains free to submit future manuscripts to SAF/PA and to utilize his counsel during the review process, so long as he does not reveal classified information to his counsel. Nothing in the

Department's efforts to prevent further disclosures of classified information violated the First Amendment or the Administrative Procedure Act.

What remains of Dr. Hopkins's claims is his challenge to the amendments the Department required after it finished reviewing his manuscripts. But, as detailed in the Classified Appendix, those amendments were tailored to ensure that the publication of those manuscripts would not improperly reveal information classified under Executive Order 13,526 and/or the Atomic Energy Act. The information at issue is sensitive information pertaining to, among other things, the Nation's nuclear strategies and defenses. It was properly classified by an original classification authority; it is owned by the government; and its disclosure would harm national security. The Court has upheld classification decisions based on similar showings in numerous other prepublication review cases. Dr. Hopkins therefore has no right to publish the information at issue, as he agreed when he signed his nondisclosure agreement.

For these reasons, the Court should grant the Department's motion, dismiss Dr. Hopkins's procedural claims as non-justiciable, and otherwise enter judgment for the Department.

## BACKGROUND

### I.      Statutory and Regulatory Background

"[N]o governmental interest is more compelling than the security of the

Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981). In furtherance of that compelling

interest, the Executive Branch classifies national security information according to

its sensitivity and strictly limits access to it. *See Dep't of the Navy v. Egan*, 484

U.S. 518, 527 (1988). The Executive Branch's authority to do so flows from,

among other things, the President's constitutional role as head of the Executive

Branch and Commander in Chief. *Id.*

Classification decisions are governed by a comprehensive set of guidelines

prescribed by executive order and regulation. Most notably, Executive Order

13,526 "prescribes a uniform system for classifying, safeguarding, and

declassifying national security information." *Classified National Security*

*Information*, Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009). Pursuant

to Executive Order 13,526, information may be originally classified only if, among

other things, an official with "classification authority" decides that its release could

result in damage to the national security and it relates to one or more specified

subject matters. *Id.* §§ 1.1, 1.4. Various statutes also protect certain categories of

information; for example, the Atomic Energy Act creates a classification regime

for information relating to nuclear weapons and materials. 42 U.S.C. § 2014(y).

4

As a condition of access to classified information, the Executive Branch requires employees with such access to sign an approved nondisclosure agreement. *See, e.g.*, Exec. Order No. 13,526, § 4.1(a)(2). One such form is the Standard Form ("SF") 189, which was replaced in 1988 by the SF 312. Both forms are titled Classified Information Nondisclosure Agreement, and must be signed by any employee with access to "classified information," defined as information that has been "classified under the standards" of the Executive Order in effect at the time (then Executive Order 12,356, now 13,526) or "any other Executive order or statute that prohibits the unauthorized disclosure of information." App. 1; SF 312, § 1, https://perma.cc/CBK3-PKPR (last visited September 29, 2023). Both forms obligate the employee to preserve the secrecy of classified information and to confirm with authorized officials if he is uncertain about the classification status of information he wishes to disclose. App. 1; SF 312 §§ 1, 3.[1]

In signing these nondisclosure agreements, employees generally acknowledge that the government "may seek any remedy available to it" to enforce its rights under the agreements, including a court order prohibiting disclosure as well as criminal and civil sanctions. App. 1; SF 312 §§ 3, 6-7. Employees also

---

[1]   Employees who obtain access to a subset of classified information known as Sensitive Compartmented Information ("SCI") also sign Form 4414, entitled Sensitive Compartmented Information Nondisclosure Agreement. Form 4414 reiterates many of the secrecy obligations contained in SF 312 and also states that an employee agrees "to submit for security review" any "writing" that the employee has reason to believe contains SCI. Form 4414, § 4, https://perma.cc/6RDE-6PHZ (last visited September 29, 2023). The Complaint implies that Dr. Hopkins also signed this form. Compl. ¶¶ 7, 25.

assign to the government all rights, royalties, and remunerations that result from unauthorized disclosure in violation of the agreements. App. 1; SF 312 § 5. Prior to signing these forms, employees may discuss any questions with a briefing officer and request access to the legal materials governing classified information. App. 1; SF 312 § 12.

The Department's prepublication review process is conducted by the Defense Office of Prepublication and Security Review. It is guided by two sets of Department of Defense Instructions ("DoDI"): DoDI 5230.29 and DoDI 5230.09. The instructions provide for DOPSR to conduct a "security review" to "ensure that classified information is not disclosed." App. 20. DOPSR has a website that explains the process and provides examples of what types of information must be submitted, submission and review guidelines, contact information, and hyperlinks to the applicable Department instructions. App. 38-47.

DOPSR strives to respond to prepublication review submissions within 30 business days, though it acknowledges that review may take longer, depending on various factors such as the length or complexity of a submission, the extent of classified information it implicates, or the number of agencies that must review it. App. 24. As DOPSR currently notes on its website, "[d]ue to an increased number of submissions, book-length manuscript reviews are currently taking several months" and individuals should "ensure adequate time for a prepublication security

and policy review prior to committing to any publishing deadlines or sending the manuscript to a person or organization for endorsement." App. 41.

Former Air Force employees may submit manuscripts directly to the United States Secretary of the Air Force Office of Public Affairs for review. That process is guided by Chapter 9 of Air Force Instruction 35-101 ("AFI 35-101") and Chapter 8 of Air Force Manual 35-101 ("AFMAN 35-101"). "Former military and Department of the Air Force civilian employees" must use the process "to ensure DoD-related information released to the public is consistent with their requirement to safeguard classified material." App. 192. Although SAF/PA instructs submitters to "allow a minimum of 10 work days for review," it cautions that "[s]ome complex documents … may require higher headquarters review," including by "DOPSR[] and other federal agencies, and can take an additional 45-60 days to process." App. 259.

The Department provides an administrative appeal process by which individuals can contest review decisions. App. 25. Individuals dissatisfied with a decision can pursue judicial review. *See, e.g., Shaffer v. DIA*, 102 F. Supp. 3d 1, 12-15 (D.D.C. 2015).

## II.   Factual Background

Plaintiff Dr. Hopkins alleges that he served in the Air Force from 1983-1991. Compl. ¶ 25, ECF No. 1. He also alleges that, at the time of his discharge, he

had a Top Secret security clearance with access to Sensitive Compartmented

Information ("TS/SCI"). *Id.*

To obtain and/or maintain his security clearance, Dr. Hopkins was required

to sign at least one non-disclosure agreement: the SF 189. App. 1. Notably, Dr.

Hopkins has never disputed that, as a person with a TS/SCI clearance, he is

obligated by that agreement as well as any others he may have signed to refrain

from disclosing classified information and to submit any manuscripts that may

contain classified information for prepublication review. Compl. & Answer ¶¶ 6-7;

App. 8-11. To the contrary, he has submitted numerous manuscripts for review.

Specifically, this case involves seven manuscripts that Dr. Hopkins

submitted to SAF/PA or DOPSR, all of which have now completed review.

***Klaxon!.*** Dr. Hopkins claims to have submitted the text of a book, *Klaxon!*

*Strategic Air Command Alert During the Cold War*, to SAF/PA for review on

December 14, 2020. Compl. ¶ 36. On July 8, 2021, SAF/PA acknowledged receipt

of the book. Compl. & Answer ¶ 41. On July 26, SAF/PA completed its review of

*Klaxon!*, and referred the manuscript to DOPSR because it concluded the

manuscript contained "subject matter of interest to at least two DoD components."

*Id.* ¶¶ 43, 45. DOPSR referred *Klaxon!* to three additional Department components.

*Id.* ¶ 46; App. 9.

***Crowded Skies.*** On October 6, 2021, Dr. Hopkins's counsel submitted a book, *Crowded Skies: Cold War Reconnaissance Over the Baltic*, to DOPSR for review on behalf of Dr. Hopkins. Compl. & Answer ¶ 60. DOPSR official Paul Jacobsmeyer replied to counsel, explaining that "DOPSR does not work with, or accommodate, publishers' timelines," and asking counsel to "[p]lease have the author contact us directly with appropriate contact information." *Id.* ¶ 63. He also advised that "[f]ailure to provide this information will result in the denial of Security Review of this manuscript and administrative closure of this case." *Id.* After DOPSR did not receive a response, it administratively closed its review. *Id.* ¶ 64; App. 7-8.

***Searching for Mobile ICBMs.*** On January 6, 2022, Dr. Hopkins's counsel submitted an article, *Searching for Mobile ICBMs*, to SAF/PA for review on behalf of Dr. Hopkins. Compl. & Answer ¶ 54; App. 10. Because this article also involved the equities of other Department components, SAF/PA referred it to DOPSR for processing on January 21, 2022, and instructed Dr. Hopkins's counsel to refer requests involving similar subject matter to DOPSR in the future. Compl. & Answer ¶ 57; App. 10.

***Bring Back the Looking Glass, Effectiveness of the Alert Force, Why 15 Minutes Is Irrelevant, and DoD Prepublication Review.*** On January 14, 2022, Dr. Hopkins's counsel submitted four articles, *Bring Back the Looking Glass? Do We*

*Need 24/7 Airborne Command Posts*, *Effectiveness of the Alert Force*, *Why 15 Minutes Is Irrelevant*, and *DoD Prepublication Review: A Broken, Arbitrary System Predisposed to Rejection*, to DOPSR for review on behalf of Dr. Hopkins. Compl. & Answer ¶¶ 75, 78, 81, 84. Counsel also informed DOPSR that "all correspondence regarding these submissions must be directed to me." *Id.* ¶ 65; App. 301.

On February 28, 2022, DOPSR chief George Sturgis replied to Dr. Hopkins's counsel:

> We note that you have submitted several prepublication review requests on behalf of your client, Dr. Hopkins, most recently on January 14, 2022. An Action Officer emailed you last fall regarding Dr. Hopkins' second book submission informing you that DOPSR needed the author's contact info, and that DOPSR could not start the review without his information. As you did not respond to multiple requests, DOPSR closed Dr. Hopkins' book submission on November 24, 2021.
>
> You have indicated that you are the sole correspondent for Dr. Hopkins' submissions, and that DOPSR is not right to administratively close any of the submissions. This is incorrect. As Dr. Hopkins is the author, held a security clearance, and has the prepublication obligation, he has the institutional responsibility and legal requirement to ensure that there is no non-public DoD information in the submissions. DoD's relationship is with the author, not his legal representative. Failure of the author to correspond with the DoD evades the intent of the prepublication review process to not disclose non-public DoD information.
>
> Our insistence on this process is standard DoD policy. To underscore the seriousness of this matter, reviewing components have identified instances of non-public information in Dr. Hopkins' first book submission, and based on the subject of the submissions, there is a

likelihood that the second book and articles contain non-public DoD information. Providing this material to you is a violation of Dr. Hopkins' non-disclosure agreement. This violation could result in an Unauthorized Disclosure investigation by the Defense Counterintelligence and Security Agency. DoD's continued engagement with you perpetuates and endorses this unauthorized disclosure of DoD information by sanctioning your unauthorized access to the author's submissions. Hence, we are closing all of Dr. Hopkins' requests until he contacts our office.

Compl. & Answer ¶¶ 71-73; App. 304.

Nevertheless, DOPSR ultimately completed its review of all of these publications, and required redactions to *Crowded Skies*, *Klaxon!*, *Searching for Mobile ICBMs*, *Bring Back the Looking Glass?*, and *Why 15 Minutes Is Irrelevant*. DOPSR also reviewed the photographs and captions for both *Crowded Skies* and *Klaxon!*, which were submitted by Dr. Hopkins's counsel in Spring 2023 after this lawsuit was filed. *See* App. 11; Classified App.

## III.  **This Lawsuit**

Dr. Hopkins filed this lawsuit on March 27, 2022. *See* Compl. He asserts eleven causes of action: two alleging that *Klaxon!* and *Searching for Mobile ICBMs* were improperly referred to DOPSR (First and Second Causes of Action), one alleging that SAF/PA categorically ordered him to submit all future manuscripts to DOPSR (Third), seven alleging that DOPSR improperly administratively closed its review of all of his manuscripts (Fourth through Tenth),

11

and one alleging that any DOPSR policy of administratively closing requests submitted by counsel is unlawful (Eleventh). *Id.*

Each of these causes of action asserts a variety of claims under the First Amendment and the Administrative Procedure Act. For example, as to the First Amendment, Dr. Hopkins repeatedly alleges that the Department improperly prohibited Dr. Hopkins from disclosing unclassified information, that the Department retaliated against Dr. Hopkins for complaining about the prepublication review process, and that the Department improperly barred Dr. Hopkins from utilizing his attorney. *See id.*, First through Eleventh Causes of Action. As to the Administrative Procedure Act, Dr. Hopkins alleges that the Department's decisions violated Department regulations or were otherwise arbitrary and capricious. *See id.* Dr. Hopkins seeks to compel the Department to process his manuscripts and, ultimately, to allow him to publish those manuscripts in their totality. *See id.*, Prayer for Relief.

## STANDARD OF REVIEW

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 271-72 (5th Cir. 2021) (quotations omitted). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint

supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

To the extent the Court has subject-matter jurisdiction, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In a prepublication review case where the agency supports its redactions with affidavits, "[s]ummary judgment is warranted … when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quotation omitted); *accord Huddleston v. FBI*, 2022 WL 4593084, at *15 (E.D. Tex. 2022).

## ARGUMENT

### I.   Dr. Hopkins's challenges to the procedures used to review his manuscripts are non-justiciable.

As a threshold matter, Dr. Hopkins's challenges to the procedures used to review his manuscripts are not justiciable because the review process has now been completed as to all of the manuscripts identified in the Complaint. The proper course is therefore to dismiss these claims for lack of subject matter jurisdiction under Rule 12(b)(1). *Goodrich v. United States*, 3 F.4th 776, 779 (5th Cir. 2021)

13

("When courts lack subject matter jurisdiction over a case, they lack the power to adjudicate the case and must dismiss it.") (quotation omitted). Specifically, his claims are moot as to the manuscripts listed in the Complaint, which have already completed prepublication review. Moreover, to the extent he intends to challenge the procedures that may be used to review other, hypothetical manuscripts in the future, he lacks standing to do so, and his claims are not ripe.

### A.    Dr. Hopkins's procedural claims are moot.

Many of Dr. Hopkins's procedural claims are now moot because the Department has completed its prepublication review of all of the manuscripts identified in the Complaint. Specifically, Dr. Hopkins asserts, among other things, that SAF/PA improperly referred *Klaxon!* and *Searching for Mobile ICBMs* to DOPSR (First and Second Causes of Action); that DOPSR improperly closed its review of *Klaxon!*, *Searching for Mobile ICBMs*, *Crowded Skies*, *Bring Back the Looking Glass?*, *Effectiveness of the Alert Force*, *Why 15 Minutes Is Irrelevant*, *DOD Prepublication Review* (Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action); and that DOPSR improperly refused to work with his attorney throughout the review process (Eleventh Cause of Action). Whether or not the Department improperly referred or closed Dr. Hopkins's requests, however, all of his manuscripts have now been reviewed, and the relief that he requests as to these claims—compelling SAF/PA or DOPSR to expedite its review or issue a

14

final determination as to these manuscripts, *see, e.g.*, Compl. ¶¶ 95, 103, 123, 135, 147, 159, 171, 183, 195—is relief he has now received.

"Mootness, of course, is a jurisdictional defect," because "the exercise of judicial power depends upon the existence of a case or controversy." *A&R Engineering & Testing, Inc. v. Scott*, 72 F.4th 685, 689 (5th Cir. 2023) (quoting *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3 (1964)). "A live controversy must maintain through each stage of the litigation." *Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 831 (5th Cir. 2023). Thus, "any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Id.* at 831-32 (quoting *DeOtte v. Nevada*, 20 F.4th 1055, 1064 (5th Cir. 2021)).

"In general, a claim becomes moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Ermuraki v. Renaud*, 987 F.3d 384, 386 (5th Cir. 2021) (quoting *La. Env't Action Network v. EPA*, 382 F.3d 575, 581 (5th Cir. 2004)). This occurs when, for example, "intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff," *id.* (quoting *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir 2013)), or when there is not "a sufficient prospect that the decision will have an impact on the parties," *Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 548 (5th Cir. 2020) (quoting 13B Charles Alan

Wright et al., Fed. Prac. & Proc. § 3533 (3d ed. 2020)). Moreover, "resolution of a particular issue may be moot even if other issues on appeal remain ripe." *Id.* at 548.

Here, Dr. Hopkins's procedural challenges are "moot because there is no further relief that this Court can provide as to [those claims]." *Stillman v. CIA*, 517 F. Supp. 2d 32, 36 (D.D.C. 2007). Because Dr. Hopkins "has already received the final classification decision[s] that he sought from [DoD]" as to the manuscripts at issue in the Complaint, "this Court lacks subject matter jurisdiction over" these claims. *Stillman*, 517 F. Supp. 2d at 36; *see also Doe v. Doe Agency*, 608 F. Supp. 2d 68, 72 (D.D.C. 2009) (same); *Boening v. CIA,* 579 F. Supp. 2d 166, 172 (D.D.C. 2008) (same); *cf. U.S. Navy SEALs 1-26 v. Biden*, 72 F.4th 666, 671-73 (5th Cir. 2023) (dispute over vaccine mandate moot after agency repealed mandate).

Dr. Hopkins also asks the Court to order DoD to "pay [him] compensatory damages," Compl., Prayer for Relief ¶ 6, but that requested relief cannot defeat mootness. Monetary damages are unavailable here because the APA does not provide a waiver of sovereign immunity for damages. *See* 5 U.S.C. § 702 (granting federal government's consent to suit in actions "seeking relief *other than* money damages") (emphasis added); *see also Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988) (APA prohibits awards of money damages, *i.e.*, money "given to the

16

plaintiff to substitute for a suffered loss"). Moreover, to the extent Dr. Hopkins

intends to assert a claim under *Bivens*, "the Supreme Court has not only never

recognized a *Bivens* cause of action under the First Amendment, but also once

rejected a First Amendment retaliation *Bivens* claim for federal employees."

*Watkins v. Three Admin. Remedy Coordinators of Bureau of Prisons*, 998 F.3d

682, 686 (5th Cir. 2021) (citations omitted).

For these reasons, Dr. Hopkins's procedural claims are moot to the extent

they challenge the manner in which the Department reviewed his manuscripts and

seek only relief that is unavailable or that already has been granted.

## B.     Dr. Hopkins lacks standing to assert his procedural claims and/or such challenges are unripe.

To the extent Dr. Hopkins seeks to challenge the procedures that the

Department might use to review any hypothetical future publications he might

submit, those claims fail on standing and ripeness grounds. Specifically, Dr.

Hopkins alleges, among other things, that SAF/PA has purportedly "directed him

to submit all future manuscripts, regardless of subject matter, to DOPSR directly,"

Compl. ¶ 105 (Third Cause of Action); and that the Department purportedly has

"an official policy of administratively closing any requests for prepublication

review submitted by an attorney on behalf of an author," *id.* ¶ 197 (Eleventh Cause

of Action). He also asserts that, "[a]s a well-respected author of military history

books and articles with a continuing duty to submit materials for prepublication

17

review, [he] will continue to be harmed by [the administrative closure] policy in the future." *Id.* ¶ 205.

"To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Article III standing thus guarantees that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

Dr. Hopkins's claims founder on the "actual or imminent" injury requirement. "The 'actual or imminent' requirement is satisfied only by evidence of a 'certainly impending' harm or a 'substantial risk' of harm." *Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 & n.5 (2013)). "Allegations of possible future injury do not satisfy the requirements of Art. III." *E.T. v. Paxton*, 41 F.4th 709, 716 (5th Cir. 2022). "Although 'imminence' is

concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Lujan*, 504 U.S. at 564 n.2.

There is no "certainly impending" injury here. Dr. Hopkins does not allege or present evidence to indicate that he has any additional manuscripts that he has submitted to the Department, nor that he intends to submit any such manuscripts to the government in the near future. There is thus no basis for concluding that Dr. Hopkins will be imminently required to submit a manuscript to DOPSR directly, or that any such submissions would be subjected to DOPSR's purported policy of closing all requests for prepublication review submitted by an attorney (even if such a policy existed).

It is therefore entirely speculative whether any future manuscript Dr. Hopkins might submit to the Department would be referred or administratively closed. Although Dr. Hopkins asserts that he may, as an author, be harmed by the Department's prepublication review policies when he chooses to submit additional manuscripts some day in the future, Compl. ¶ 205, basing standing on "such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be" would "stretch[]" the imminence requirement "beyond the breaking point." *Lujan*, 504 U.S. at 564 & n.2.

19

For similar reasons, these claims are unripe. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) ("[S]tanding and ripeness boil down to the same question in this case."). Under Article III, "a case or controversy must be ripe for decision, meaning that it must not be premature or speculative." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002) "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). To determine whether a case is ripe, courts assess "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Rosedale Missionary Baptist Church v. New Orleans*, 641 F.3d 86, 91 (5th Cir. 2011).

These standards, too, have not been met. Dr. Hopkins's "speculative claims regarding hypothetical future violations are not ripe," because "[n]ot only may these contingencies never occur, but whether [the Department] has completed a specific classification review in a timely manner or has made the proper classification decisions depends on the facts of the particular case." *Doe*, 608 F. Supp. 2d at 72. Specifically, whether any future manuscripts would merit referral or administrative closure, and whether any such manuscripts have been unreasonably delayed, would depend on the content of those manuscripts and the

20

extent to which Dr. Hopkins complies with the regulations governing the prepublication review process. And Dr. Hopkins will not suffer any hardship by waiting to challenge any such policies governing referral or administrative closure until he actually submits a manuscript and it is referred or administratively closed.

Asking the court to opine on the lawfulness of purported policies that do not exist and have not yet been applied to any hypothetical manuscripts Dr. Hopkins might someday wish to publish is a request for an advisory opinion. But "[a] federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

For these reasons, the Court lacks jurisdiction to adjudicate Dr. Hopkins's procedural claims to the extent they challenge policies that might be applied to any future manuscripts.

## II.    Dr. Hopkins's procedural claims fail on the merits.

To the extent Dr. Hopkins's procedural claims are justiciable, those claims nonetheless fail to establish a violation of the First Amendment or the Administrative Procedure Act. The Court should therefore enter judgment for the Department on any of these claims as to which it finds jurisdiction.

21

## A.     The Department reasonably processed Dr. Hopkins's manuscripts.

Dr. Hopkins asserts that the government violated the First Amendment and the Administrative Procedure Act by arbitrarily referring, administratively closing, and otherwise delaying its review of his manuscripts in response to his complaints about the prepublication review process. But the allegations of the Complaint themselves, the correspondence incorporated within, and the Unclassified Declaration of George Sturgis, the head of DOPSR, debunk that theory.[2] To the contrary, the record evidence demonstrates that the Department's decisions were an entirely reasonable method of dealing with Dr. Hopkins's repeated failures to comply with the rules governing the prepublication review process—failures that risked the unauthorized exposure of classified information.

As Dr. Hopkins concedes, his counsel submitted an unredacted copy of *Crowded Skies* to DOPSR on October 6, 2021, Compl. & Answer ¶ 60, and also attempted to correspond with DOPSR regarding *Klaxon!*, *id.* ¶ 40. *See also* App. 6-8. Both manuscripts contained information that reviewers concluded was properly classified and to which Dr. Hopkins's counsel could not lawfully have access. *See*

---

[2]   An agency may submit a declaration to explain its actions where it provides a "reasoned, contemporaneous explanation for its decision" to "facilitate effective judicial review." *Olivares v. TSA*, 819 F.3d 454, 463 (D.C. Cir. 2016); *cf. Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) ("[T]here is nothing improper in receiving declarations that merely illuminate[] reasons obscured but implicit in the administrative record.") (quotation omitted). Here, the Sturgis Declaration demonstrates that the general policies challenged by Dr. Hopkins do not exist as alleged in the Complaint, meaning that there is necessarily no administrative record for them. The declaration also explains how the Department's processing of Dr. Hopkins's manuscripts complied with its regulations.

Compl. & Answer ¶ 73; App. 9-10, 304; Classified App. DOPSR official Paul Jacobsmeyer therefore asked Dr. Hopkins's counsel to "have the author contact [DOPSR] directly with appropriate contact information," so that DOPSR could correspond with Dr. Hopkins directly concerning the classified information. Compl. & Answer ¶ 63; App. 297. Counsel nonetheless submitted unredacted copies of five additional articles to SAF/PA, Compl. & Answer ¶ 54, and DOPSR, *see id.* ¶¶ 60, 65, 75, 78, 81, 84, three of which, reviewers concluded, also contained classified information. *See id.* ¶ 73; App. 304; Classified Appendix.

The Department therefore sought to preempt any further exposures of classified information. As DOPSR Chief George Sturgis explained to Dr. Hopkins's counsel, "Dr. Hopkins is the author, held a security clearance, and has the prepublication obligation," meaning that "he has the institutional responsibility and legal requirement to ensure that there is no non-public DoD information in the submissions." Compl. & Answer ¶ 72; App. 304. "Failure of the author to correspond with the DoD evades the intent of the prepublication review process to not disclose non-public DoD information." *Id.*

Indeed, as Sturgis reiterated, "reviewing components ha[d] identified instances of non-public information in Dr. Hopkins' first book submission, and based on the subject of the submissions," concluded that "there is a likelihood that the second book and articles contain non-public DoD information." Compl. &

Answer ¶ 73; App. 304. Sturgis further advised Dr. Hopkins's counsel that "[p]roviding this material to you is a violation of Dr. Hopkins' non-disclosure agreement," which "could result in an Unauthorized Disclosure investigation." *Id.* Sturgis therefore informed Dr. Hopkins's counsel that DOPSR was "closing all of Dr. Hopkins' requests until he contacts our office." *Id.* Once DOPSR obtained contact information for Dr. Hopkins, however, it continued its review of his manuscripts and completed its review as to all of them. *See* Classified Appendix (justifying redactions).

The Department has at no point impeded Dr. Hopkins's ability to submit publications for review moving forward. Dr. Hopkins asserts that SAF/PA issued a "categorical order," Compl. ¶ 108, directing him to "submit all future manuscripts, regardless of subject matter, to DOPSR directly," *id.* ¶ 105. But the record evidence shows that his manuscripts were referred to DOPSR because they involved the equities of other Department components. App. 7-8. Dr. Hopkins remains free to "submit future publications directly to SAF/PA pursuant to AFI35-101," although "SAF/PA may refer such publications to DOPSR if the publications concern DoD entities that are not under Air Force control, or if any of the criteria in DoDI 5230.29, Enclosure 3, Section 1 are satisfied." App. 2.

Nor does the Department maintain an "official policy of administratively closing any requests for prepublication review submitted by an attorney on behalf

of an author," which the Complaint suggests but does not explicitly allege. Compl. ¶¶ 197-98. Again, the Department simply administratively closed *Dr. Hopkins's* requests until such time as it could securely correspond with him about the classified information in his manuscripts. Compl. & Answer ¶ 73; App. 304.

In sum, Dr. Hopkins's claims that the Department treated him unfairly in the prepublication review process do not hold up to scrutiny. To the contrary, the undisputed record evidence shows that the Department sought to work with Dr. Hopkins and his counsel to complete its review of his manuscripts without imperiling the government—and the Nation's—interest in protecting the secrecy of classified information.

**B.      Dr. Hopkins's First Amendment claims fail.**

None of these efforts to hold Dr. Hopkins to his agreement to refrain from disclosing potentially classified information until completing the prepublication review process violated the First Amendment.

**1.      The Department did not violate Dr. Hopkins's First Amendment rights by requiring him to comply with the prepublication review process.**

The gravamen of Dr. Hopkins's First Amendment claims is that the Department violated his rights when it required him to comply with the prepublication review process, to wait for a final determination, and ultimately, to refrain from publishing classified information in the manuscripts at issue. *See, e.g.*,

Compl. ¶¶ 94, 101, 110, 115-19, 127-31, 139-43, 151-55, 163-67, 175-79, 187-91. But it is well established that the government's prepublication review policies do not violate the First Amendment by preventing individuals who voluntarily and knowingly signed nondisclosure agreements, like Dr. Hopkins, from disclosing information protected by such agreements. *See, e.g.*, *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980); *Edgar v. Haines*, 2 F.4th 298, 312 (4th Cir. 2021). By entering into these agreements, Dr. Hopkins agreed to comply with prepublication review and "'relinquishe[d] his First Amendment rights' to the sensitive information those agreements protect." *Edgar*, 2 F.4th at 312 (quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975)).

*Snepp v. United States* provides the standard for determining an employee's First Amendment rights in a prepublication review challenge. Under *Snepp*, "it is well settled that a person's First Amendment right to freedom of speech yields to the government's 'compelling interest' in preventing the publication or dissemination of classified information." *Wilson v. McConnell*, 501 F. Supp. 2d 545, 551 (S.D.N.Y. 2007) (citing *Snepp*, 444 U.S. at 509 n.3; *Alfred A. Knopf*, 509 F.2d at 1370; and *United States v. Marchetti*, 466 F.2d 1309, 1315-16 (4th Cir. 1972)), *aff'd sub nom. Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009). Indeed, "[c]ourts have uniformly held that current and former government employees have no First Amendment right to publish properly classified information to which they

gain access by virtue of their employment." *Stillman*, 517 F. Supp. 2d at 38.

"[O]nce a government employee signs an agreement not to disclose information

properly classified pursuant to executive order, that employee 'simply has no first

amendment right to publish' such information." *Wilson*, 586 F.3d at 183-84 (citing

*Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003)).

     *Snepp* involved a former CIA agent who upon joining the Agency "executed

an agreement promising that he would 'not publish any information or material

relating to the Agency, its activities or intelligence activities generally, either

during or after the term of his employment without specific prior approval by the

Agency.'" 444 U.S. at 508 (cleaned up). When he left the CIA, Snepp signed

another agreement "reaffirm[ing] his obligation 'never' to reveal 'any classified

information, or any information concerning intelligence or CIA that has not been

made public by CIA,'" without the CIA's consent. *Id.* at 508 n.1. He nonetheless

published a book about the CIA's activities in Vietnam without submitting it for

review. *Id.* at 507. The government sued, seeking "a declaration that Snepp had

breached the contract, an injunction requiring [him] to submit future writings for

prepublication review, and … a constructive trust" on his profits from the

publication. *Id.* at 508. After the district court enjoined the unauthorized

publications and imposed a constructive trust, the Fourth Circuit affirmed the

injunction but reversed the constructive trust. *United States v. Snepp*, 595 F.2d 926 (4th Cir. 1979).

The Supreme Court reversed, holding that both the injunction and the constructive trust were proper. 444 U.S. at 516. The Court rejected the argument that Snepp's secrecy agreement was "unenforceable as a prior restraint on protected speech." *Id.* at 509 n.3. The Court explained that Snepp had signed the agreement "voluntarily" and that it was "a reasonable means for protecting" the "compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Id.* The Court further held that Snepp's violation of his review obligation did "not depend upon whether his book actually contained classified information." *Id.* at 511. It explained that when a former government employee "relies on his own judgment about what information is detrimental" to national security, "he may reveal information that" a government agency, "with its broader understanding of what may expose classified information and confidential sources[,] could have identified as harmful." *Id.* at 512.

*Snepp* was applied by the Fourth Circuit to reject a prepublication review challenge just two years ago. In *Edgar v. Haines*, the Fourth Circuit rejected a facial challenge to the prepublication review regimes of several agencies, including the Department, that "allow the agencies to redact information that is classified." 2

28

F.4th at 303-06, 315. The Court noted that, "in signing … nondisclosure agreements, the employee 'effectively relinquishes his First Amendment rights' to the sensitive information those agreements protect. " *Id.* at 312 (quoting *Alfred A. Knopf*, 509 F.2d at 1370). The court concluded "that the defendant agencies' prepublication review regimes are a reasonable means of serving the government's compelling interest in keeping classified or otherwise sensitive information secret, and therefore they do not violate the plaintiffs' First Amendment speech rights." *Id*. at 316.

*Snepp* forecloses any claim that adherence to the prepublication review process violated Dr. Hopkins's First Amendment rights. Dr. Hopkins does not challenge the nondisclosure agreement that he voluntarily entered into with the Department, nor does he dispute that he is subject to a prepublication review obligation. This agreement subjects the potential disclosure of "classified" information to certain disclosure constraints. App. 1. Dr. Hopkins "voluntarily sign[ed] these agreements" and, in so doing, he "knowingly waived [his] First Amendment rights to challenge the requirement that [he] submit materials for prepublication review and the stated conditions for prepublication review." *Edgar*, 2 F.4th at 313-14. He must therefore fully participate in the prepublication review process and may not publish manuscripts that may contain classified information unless and until he is authorized by the Department to do so.

Because Dr. Hopkins's manuscripts potentially contained classified information, he was required to seek authorization to disclose them by submitting them for prepublication review. Indeed, the Department determined in the prepublication review process that Dr. Hopkins's manuscripts did, in fact, contain classified information, and properly redacted this information. This redacted information is protected from public disclosure, and by entering into a nondisclosure agreement, Dr. Hopkins "'relinquishe[d] his First Amendment rights'" to disclosing "the sensitive information those agreements protect." *Edgar*, 2 F.4th at 312 (quoting *Alfred A. Knopf, Inc.*, 509 F.2d at 1370). Accordingly, Dr. Hopkins's claim that requiring him to comply with the prepublication review process violated his First Amendment rights fails as a matter of law.

### 2. The Department did not unconstitutionally retaliate against Dr. Hopkins.

For similar reasons, Dr. Hopkins's retaliation claims also fail. Dr. Hopkins repeatedly alleges that the Department referred or administratively closed his requests "as retaliation for Hopkins's complaints about the process and his attempts to protect his First Amendment rights." Compl. ¶ 102; *see also id.* ¶¶ 107, 121, 133, 145, 157, 169, 181, 193. To state a retaliation claim, Dr. Hopkins must meet three requirements: (1) that he was "engaged in constitutionally protected activity"; (2) that the Department's actions "caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that

30

activity"; and (3) that the Department's "adverse actions were substantially motivated against [his] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

Even assuming that Dr. Hopkins's complaints about the prepublication review process constitute protected speech, he cannot show that the Department harmed him in response. "[A] retaliation claim requires some showing that the plaintiffs' exercise of free speech has been curtailed." *Id.* at 259. But Dr. Hopkins does not allege any facts, and certainly cannot present any evidence sufficient to raise a dispute of material fact, to suggest that the Department's actions chilled him from continuing to criticize the prepublication process. To the contrary, Dr. Hopkins submitted an article critical of the process even after several of his publications had already been referred or administratively closed. *See* Compl. & Answer ¶¶ 84-87. He has continued to submit publications for review, including the photographs and captions for *Crowded Skies* and *Klaxon!* he submitted while this litigation was pending. App. 13. And he remains free to submit publications to SAF/PA with his counsel's assistance, subject to the requirement that he not reveal classified information to his counsel in so doing, and the usual provisions governing the elevation of publications to DOPSR. App. 2. Dr. Hopkins therefore cannot show that his speech has been chilled.

Moreover, the Fifth Circuit has explained that "[a]lthough some actions may have ... the effect of chilling [the plaintiff's] protected speech, they are not actionable." *Colson v. Grohman*, 174 F.3d 498, 511 (5th Cir. 1999) (quoting *Pierce v. Texas Dep't of Crim. J.*, 37 F.3d 1146, 1150 (5th Cir. 1994)). These include "investigations" that "do not lead to some more tangible adverse action." *Id.* at 513. At most, the Department delayed the review of several of Dr. Hopkins's publications before ultimately completing the review process; Dr. Hopkins has not attempted to show, for instance, that his complaints affected the substance of the Department's ultimate decisions. Without more, Dr. Hopkins has not shown the level of adverse action needed to state a First Amendment claim.

Nor can Dr. Hopkins show that the Department's actions were "substantially motivated," *Keenan*, 290 F.3d at 258, by his criticisms of the prepublication review process. Indeed, Dr. Hopkins's article criticizing the prepublication process, s*ee* Compl. & Answer ¶¶ 84-87, came *after* DOPSR had already referred or administratively closed some of his requests, *see id.* ¶¶ 46, 64. Regardless, "merely relying on … temporal proximity between the conduct and any adverse action … is insufficient to show First Amendment retaliation." *Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 230 (5th Cir. 2016).

As explained above, SAF/PA referred two of Dr. Hopkins's manuscripts to DOPSR because they involved information relevant to other Department

components, and DOPSR administratively closed its review of his publications because it could not correspond with Dr. Hopkins concerning their classified substance. *See supra* Section II.A. When the Department became confident that it could continue the review process without sanctioning those exposures or risking further ones, it promptly resumed doing so, and ultimately completed its review of every publication submitted by Dr. Hopkins. That chain of events does not evince retaliatory intent or provide the basis for a First Amendment retaliation claim.

### 3. Dr. Hopkins's counsel is not entitled to access classified information.

Finally, Dr. Hopkins asserts that the Department violated his First Amendment rights by administratively closing his requests rather than communicating with his counsel. *See, e.g.*, Compl. ¶¶ 110, 120, 132, 144, 156, 168, 180, 192, 199-204. But the Department did not categorically decline to work with his counsel; it declined to communicate directly with his counsel regarding the substance of his manuscripts which, the Department concluded, contained *classified information*. Neither the First Amendment, nor any other constitutional requirement, compels the government to discuss classified information with Dr. Hopkins's counsel.

To the contrary, any requirement that the government communicate directly with Dr. Hopkins's counsel regarding classified information would involve grave separation-of-powers concerns. "[I]t is the responsibility of [the Executive], not

that of the judiciary, to weigh the variety of complex and subtle factors in determining whether [to disclose sensitive information]." *CIA v. Sims*, 471 U.S. 159, 180 (1985); *see also Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (protection of "intelligence sources, methods and operations is entrusted to the [Executive Branch], not to the courts" (citation omitted)). "[C]ourts may not review decisions to grant access to sensitive information made by the executive," because that decision is "'committed to the broad discretion of the agency responsible'" for the protection and control of such information. *Toy v. Holder*, 714 F.3d 881, 884 (5th Cir. 2013) (quoting *Egan*, 484 U.S. at 527); *see also Zummer v. Sallet*, 37 F.4th 996, 1011 (5th Cir. 2022) ("The Constitution textually commits to the President the decision whether to grant someone a security clearance.").

For that reason, a private attorney is not entitled to gain access to classified information unless and until the Executive Branch has specifically concluded that he or she has a need to know for a governmental function. *Egan*, 484 U.S. at 528 ("It should be obvious that no one has a 'right' to a security clearance. The grant of a clearance requires an affirmative act of discretion on the part of the granting official."); *see also* Exec. Order 13,526, § 6.1 (dd) (a "need-to-know" determination is made within the executive branch to ensure that a prospective

recipient requires access to specific classified information to perform or assist in a lawful and authorized governmental function).

These principles are fatal to Dr. Hopkins's assertion that the Department was required to communicate with his counsel regarding classified information in his manuscripts. *See* Compl. ¶ 203. Forcing the Department to provide classified information to a private attorney simply because they represent an author subject to prepublication review would needlessly impinge upon the public's interest in maintaining the secrecy of classified information and risk countermanding the Executive Branch's judgments regarding who may access such information. The Department did not violate the First Amendment by insisting that future communications about classified information in Dr. Hopkins's manuscripts be directed to Dr. Hopkins himself.

### C.    Dr. Hopkins's Administrative Procedure Act claims fail.

Dr. Hopkins's APA claims fail for many of the same reasons. As a general matter, agency action is arbitrary and capricious only where

> the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this "highly deferential standard," *Sierra Club v. United*

*States Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (quoting *Medina Cnty.*

*Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010)), the

"court is not to substitute its judgment for that of the agency," *id.* (quoting *FCC v.*

*Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)). Rather, the agency's

decision is presumed valid, and a court considers only whether it "was based on a

consideration of the relevant factors and whether there has been a clear error of

judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

First, Dr. Hopkins asserts that SAF/PA's decisions to refer *Klaxon!* and

*Searching for Mobile ICBMs* to DOPSR were unlawful. Compl. ¶¶ 91, 98.

However, SAF/PA referred these manuscripts to DOPSR because the contents

included subject matter of interest to multiple other Department components,

Compl. & Answer ¶¶ 46; App. 9-10, which required referral beyond SAF/PA under

the Department's regulations, as Dr. Hopkins concedes, *see* App. 22, 192-95, 259-

63; Compl. & Answer ¶ 13. Put differently, both met what Dr. Hopkins refers to as

the "3-1 Criteria" for referral (which are simply guidelines): they both have the

potential to "[a]ffect national security policy" and/or "foreign relations," and

concern subjects of "potential controversy among the DoD components or with

other federal agencies." Compl. ¶ 14.

Dr. Hopkins also incorrectly claims that SAF/PA issued a "categorical

order" directing him to "submit all future manuscripts, regardless of subject matter,

36

to DOPSR directly." *Id.* ¶ 108. Again, that is not the case. Dr. Hopkins remains free to "submit future publications directly to SAF/PA pursuant to AFI35-101," although "SAF/PA may refer such publications to DOPSR if the publications concern DoD entities that are not under Air Force control, or if any of the criteria in DoDI 5230.29, Enclosure 3, Section 1 are satisfied." App. 2.

Second, Dr. Hopkins asserts that DOPSR's decision to "administratively clos[e] its review" of several of his publications violated the Department's regulations. Compl. ¶¶ 123, 135, 147, 159, 171, 183, 195. Again, the Department did so because Dr. Hopkins's counsel refused to provide Dr. Hopkins's contact information to DOPSR, forcing the Department to risk further exposures of classified information, or to risk sanctioning the previous breaches, by communicating directly with Dr. Hopkins's counsel about the substance of Dr. Hopkins's manuscripts. App. 304. Dr. Hopkins does not, and cannot, identify a regulation that the Department's decision purportedly violated. Nor does the Department maintain what Dr. Hopkins describes to as an "official policy of administratively closing any requests for prepublication review submitted by an attorney on behalf of an author." Compl. ¶¶ 197-98. The Department simply administratively closed *Dr. Hopkins's* requests until such time as it could securely correspond with him about the substance of his manuscripts. App. 304.

Moreover, the government's decisions to refer or administratively close prepublication review requests are internal procedural decisions entitled to significant deference—particularly given that they concern the potential release of classified information. "Absent constitutional constraints or extremely compelling circumstances the 'administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)). That principle is at its zenith when combined with the "long-recognized deference to the executive on national security issues," including the handling of classified information. *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 928 (D.C. Cir. 2003); *see infra* Part III. Under these standards, Dr. Hopkins cannot come close to establishing that the Department committed a "clear error of judgment," as he must to state an APA claim. *Overton Park*, 401 U.S. at 416.

* * *

Dr. Hopkins's procedural claims are moot or otherwise non-justiciable. But if the Court concludes otherwise, it should reject them on the merits. Dr. Hopkins has provided no basis for superintending the Department's prepublication review processes, particularly when the Department has tried to accommodate him without

38

risking further unauthorized exposures of classified information. The Department is therefore entitled to judgment on these claims.

### III.   Dr. Hopkins's challenges to the Department's prepublication decisions fail because the redacted information is properly classified.

Now that the Department has completed its review of the submissions detailed in the Complaint, the proper course is for the Court to determine whether the Department's redactions to these manuscripts were proper under the laws and regulations governing classified material. They were. Dr. Hopkins's claim that he has a First Amendment right to publish his manuscripts in their totality therefore fails as a matter of law. Indeed, Dr. Hopkins implicitly concedes that he only has a right to publish his manuscripts to the extent they contain unclassified information. *See, e.g.*, Compl. ¶ 94 (alleging that closure of *Klaxon!* "constitutes an impermissible infringement of his First Amendment right to publish *unclassified* information") (emphasis added); *id.* ¶¶ 101, 110, 119, 131, 143, 155, 167, 179, 191, 204 (similar); *see also* Section II.B.1, *supra*.

In a case requiring a determination whether redacted information is properly classified or protected by statute, a district court proceeds by first "inspect[ing]" the protected document *ex parte* and *in camera* and "consider[ing] any pleadings and declarations filed by the Government, as well as any materials filed by [the plaintiff]." *Stillman*, 319 F.3d at 548. Where the agency supports its redactions with declarations, "[s]ummary judgment is warranted … when [they] describe the

justifications for nondisclosure with reasonably specific detail, demonstrate that
the information withheld logically falls within the claimed exemption, and are not
controverted by either contrary evidence in the record nor by evidence of agency
bad faith." *Larson*, 565 F.3d at 862 (quotation omitted).

Once the Court has reviewed the parties' filings, it "should then determine
whether it can, consistent with the protection of [Dr. Hopkins's] first amendment
rights to speak and to publish, and with the appropriate degree of deference owed
to the Executive Branch concerning classification decisions, resolve the
classification issue without the assistance of plaintiff's counsel." *Stillman*, 319
F.3d at 548. Thus,

> a district court must first attempt to resolve a classification challenge
> ex parte and before reaching any associated constitutional questions,
> such as whether the author has a First Amendment right to publish
> classified information or whether his counsel must be provided access
> to classified information so that he can ably assist in pursuit of the
> author's First Amendment rights.

*Shaffer*, 102 F. Supp. 3d at 10.

In light of the President's paramount responsibility over national security
and foreign affairs, and the relative institutional competence of the Executive
Branch to determine whether the disclosure of information would harm the Nation,
the Executive Branch's classification determinations receive significant deference
from courts. As explained in the attached Classified Appendix, which contains
declarations from the agency officials responsible for reviewing Dr. Hopkins's

40

manuscripts, the government appropriately redacted properly classified material that, if disclosed, would harm national security. Because the government properly determined that Dr. Hopkins's manuscripts include classified information, he is not entitled to publicly disclose this information. The Court should therefore grant summary judgment to the Department on Dr. Hopkins's classification challenges.

### A.     The Department's redaction determinations in this case are entitled to deference.

"Courts should accord the 'utmost deference' to executive assertions of privilege upon grounds of military or diplomatic secrets." *Halkin v. Helms*, 598 F.2d 1, 9 (D.C. Cir. 1978) (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974)). In "judging agency decisions and affidavits in the area of national security, … courts have given substantial weight to the expertise of the agencies charged with determining what information the government may properly release." *Simmons v. DOJ*, 796 F.2d 709, 711 (4th Cir. 1986); *see also Taylor v. Dep't of the Army*, 684 F.2d 99, 109 (D.C. Cir. 1982) (affording "utmost deference" to affidavits of intelligence officers regarding classification decisions). Courts have emphatically "reject[ed] any attempt to artificially limit the long-recognized deference to the executive on national security issues." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928 (reviewing cases).

This judicial deference to the Executive Branch in matters of national security and foreign relations is appropriate given the role assigned to the

41

Executive under our Constitution as Commander in Chief. As the Supreme Court has explained, the President's "authority to classify and control access to information bearing on national security … flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant." *Egan*, 484 U.S. at 527; *see also Toy*, 714 F.3d at 884 ("[T]he Executive Branch has broad power to determine whether to grant or revoke access to secure information."); *Holy Land Found. for Relief & Dev.*, 333 F.3d 156, 164 (D.C. Cir. 2003) (recognizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information"). "Secrecy in respect of information gathered by [the President's agents] may be highly necessary, and the premature disclosure of it productive of harmful results." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319, 320 (1936).

The Executive Branch is uniquely situated to assess the national security consequences of the disclosure of particular information. *See Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) ("Mindful that courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns."); *Ctr. for Nat. Sec. Stud.*, 331 F.3d at 928 ("[T]he judiciary is in an extremely poor position to second-guess the executive's judgment in this area of national security."). Judgments as to the harm that would result from the disclosure of classified information therefore "must be

made by those with the necessary expertise in protecting classified information," rather than by courts. *Egan*, 484 U.S. at 529.

Moreover, only the nation's intelligence community has a complete picture of which disclosures pose a danger to national security. Courts commonly refer to this as the "mosaic theory" of intelligence:

> It requires little reflection to understand that the business of foreign intelligence gathering in this age of computer technology is more akin to the construction of a mosaic than it is to the management of a cloak and dagger affair. Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate …. "The courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area."

*Halkin*, 598 F.2d at 8-9 (quoting *Marchetti*, 466 F.2d at 1318). The government's assessment of potential harm must be respected because "each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself." *Gardels v. CIA*, 689 F.2d 1100, 1106 (D.C. Cir. 1982) (quoting *Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980)); *see also Knight v. CIA*, 872 F.2d 660, 663 (5th Cir. 1989) ("[E]ven the most apparently innocuous sources and prosaic methods can yield valuable intelligence.").

Because the judiciary lacks the necessary "broad view" of national security matters, *Marchetti*, 466 F.2d at 1318, courts "defer[] to executive affidavits

predicting harm to the national security." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928. That includes in prepublication review cases. Courts "should defer to [agency] judgment as to the harmful results of publication" because the judiciary "cannot second-guess [agency] judgments on matters in which the judiciary lacks the requisite expertise." *McGehee v. Casey*, 718 F.2d 1137, 1148-49 (D.C. Cir. 1983). (citations omitted); *see also Stillman*, 319 F.3d at 549 (observing, in the context of a prepublication review case, that there is an "appropriate degree of deference owed to the Executive Branch concerning classification decisions"); *Shaffer*, 102 F. Supp. 3d at 10 ("[C]ourts afford deference to Executive Branch classification decisions because the Executive Branch generally is better positioned than the Judiciary to assess the need to classify certain information.") (citation omitted); *Berntsen v. CIA*, 618 F. Supp. 2d 27, 30-31 (D.D.C. 2009).

In sum, "it is the responsibility of the [Executive], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising" national security. *Sims*, 471 U.S. at 180. That principle cautions in favor of affording broad deference to agency declarations explaining the government's classification decisions.

**B.     The Department properly redacted classified information.**

Applying these principles, when a court conducts an *ex parte*, *in camera* review of an agency's declarations asserting that information is properly protected, it must assure itself that the agency's explanations provide "reasonable specificity" and "demonstrat[e] a logical connection between the deleted information and the reasons for classification" or protection of information. *McGehee*, 718 F.2d at 1148; *see also Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993) (in the context of considering statutorily exempted information under the FOIA, the court "do[es] not closely scrutinize the contents of a withheld document; instead, [it] determine[s] only whether there is a relevant statute and whether the document falls within that statute"); *Huddleston*, 2022 WL 4593084, at *15 (same). Where the information is classified, the agency must describe the harm to national security that would flow from disclosing classified information. *See, e.g.*, *Shaffer*, 102 F. Supp. 3d at 14.

The declarations in the Classified Appendix adequately demonstrate why the redacted information in Dr. Hopkins's manuscripts is classified under Executive Order 13,526 and/or the Atomic Energy Act and how revealing that information would cause harm to national security.

### 1.   Executive Order 13,526

Executive Order 13,526 requires four conditions for the classification of national security information: (1) the information must be classified by an "original classification authority"; (2) the information must be "owned by, produced by or for, or [be] under the control of" the government; (3) the information must fall within one of the authorized classification categories listed in section 1.4 of the Executive Order; and (4) the original classification authority must "determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and must be "able to identify or describe the damage." Exec. Order 13,526, § 1.1. The government has satisfied these four requirements.

### a.   An original classification authority classified the information.

An original classification authority classified the redacted information in Dr. Hopkins's manuscripts. The Executive Order defines "original classification authority" as "an individual authorized in writing … by agency heads or other officials designated by the President, to classify information in the first instance." *Id.* § 6.1(gg). Each of the declarants are designated as original classification authorities under Executive Order 13,526, which means that they are authorized to make classification decisions at the TOP SECRET, SECRET, and CONFIDENTIAL levels. In that capacity, they reviewed the redacted information

and determined that the redacted passages are currently and properly classified under Executive Order 13,526.

Dr. Hopkins has previously suggested that he intends to argue that the information redacted from his manuscripts "has been previously officially disclosed and is not properly classified." Pl.'s Mot. for Leave to File, ECF No. 25 (making this argument with respect to *Crowded Skies*); *see also* Compl. ¶ 36 (alleging that *Klaxon!* was "exclusively sourced from publicly released and declassified records"). He has also submitted a document to DOPSR purporting to identify official disclosures for information that the agency redacted from *Klaxon!*, which DOPSR is still in the process of reviewing. Because "[a] plaintiff asserting a claim of prior disclosure bears the 'initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld,'" *Shaffer*, 102 F. Supp. 3d at 9 (quoting *Afshar v. Dept of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)), the Department will respond to these arguments more fully when presented with Dr. Hopkins's opposition brief.

However, the information provided thus far by Dr. Hopkins does not meet the standards for showing an official disclosure. As the D.C. Circuit has explained,

> For an item to be 'officially acknowledged,' … we established three criteria. First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed; we noted, for example, that official disclosure did not waive the protection to be accorded information that pertained to a later time period. Third, we

held that the information requested must already have been made
public through an official and documented disclosure.

*Fitzgibbon*, 911 F.2d at 765. In general, Dr. Hopkins has failed to identify official

disclosures of the specific information included with his manuscripts, instead

asserting that information contained in other sources is generally similar to what he

intends to disclose. These assertions therefore provide no basis for concluding that

the information at issue has been declassified.

### b.    The information is owned by, produced by or for, or is under the control of the government.

The classified information at issue is also "owned by, produced by or for, or

is under the control of" the government. Exec. Order 13,526, § 1.1(2). Dr.

Hopkins's manuscripts relate to the activities of the Air Force—the branch in

which he served—and other branches during the Cold War—the time in which he

served with a TS/SCI clearance. *See* Compl. ¶ 25. Moreover, as explained in the

Classified Appendix, the information contained in Dr. Hopkins's manuscripts

pertains to sensitive government operations. Thus, the classified information in Dr.

Hopkins's manuscripts is information that was within the purview of the positions

he held as a government official and belongs to the government. *See Alfred A.*

*Knopf, Inc. v. Colby*, 509 F.2d at 1371 ("[N]either should [plaintiff] be heard to say

that he did not learn of information during the course of his employment if the

information was in the Agency and he had access to it.").

48

c.   **The redacted classified information falls within section 1.4(c) of the Executive Order and disclosure could reasonably be expected to cause serious harm to national security.**

The third and fourth conditions of Executive Order 13,526 require that the (3) information falls within one or more of the categories of information listed in Section 1.4 of the Order, and (4) the original classification authority has determined that the unauthorized disclosure of this information reasonably could be expected to result in damage to the national security. Exec. Order 13,526, § 1.1.

The classified information in Dr. Hopkins's manuscripts is protected under Section 1.4 of the Executive Order, which provides that information shall be considered for classification if it concerns matters including military plans, weapons systems, or operations; foreign government information; intelligence activities; foreign relations; vulnerabilities or capabilities of systems relating to national security, and weapons of mass destruction. *Id.* § 1.4. Executive Order 13,526 further provides that "SECRET" level classification "shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe." Exec. Order 13,526, § 1.2(a)(2).

As described in the Classified Appendix, the information at issue falls within numerous categories under Section 1.4 of Executive Order 13,526. The classified declarations therefore demonstrate with reasonable specificity a logical connection

49

between the classified information and the reasons for classification. *Cf. McGehee*, 718 F.2d at 1148-49; *Shaffer*, 102 F. Supp. 3d at 10-11. This satisfies the third condition of Executive Order 13,526.

Additionally, as the declarants explain, the disclosure of classified information contained in Dr. Hopkins's manuscripts could reasonably be expected to cause serious damage to national security. Courts have held that, in cases concerning national security, the harm alleged by the government need not "rise to the level of certainty," but must merely be "real and serious enough to justify the classification decision." *McGehee*, 718 F.2d at 1150. As the D.C. Circuit has explained:

> A court must take into account … that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm rather than an actual past harm. If we were to require an actual showing that particular disclosures … have in the past led to identifiable concrete harm, we would be overstepping by a large measure the proper role of a court ….

*Halperin*, 629 F.2d at 149; *see also Klaus v. Blake*, 428 F. Supp. 37, 38 (D.D.C. 1976) ("The national security issue is necessarily speculative. Intelligence deals with possibilities. Our knowledge of the attitudes of and information held by opponents is uncertain. Determinations of what is and what is not appropriately protected in the interests of national security involves an analysis where intuition must often control in the absence of hard evidence. This intuition develops from

experience quite unlike that of most Judges."). Moreover, as discussed above, "[d]ue to the mosaic-like nature of intelligence gathering, for example, what may seem trivial to the uninformed may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in context." *McGehee*, 718 F.2d at 1149 (cleaned up and citation omitted).

Courts have recognized that information pertaining to the Nation's nuclear strategies and defenses is particularly sensitive in nature. *See, e.g.*, *Egan*, 484 U.S. at 820 (referring to nuclear submarine as "the most sophisticated and sensitive weapon in the Navy's arsenal and as playing a crucial part in our Nation's defense system" in holding that Navy's decision to deny security clearance to official at submarine facility was unreviewable); *Weinberger v. Cath. Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 146 (1981) ("Due to national security reasons, however, the Navy can neither admit nor deny that it proposes to store nuclear weapons at West Loch."); *Ground Zero Ctr. for Nonviolent Action v. U.S. Dep't of the Navy*, 918 F. Supp. 2d 1132, 1146 (W.D. Wash. 2013) ("The Navy properly reasoned that disclosing the details of the maintenance and handling of nuclear missiles could reasonably be expected to have a significant adverse affect on the common defense."); *Loomis v. U.S. Dep't of Energy*, 1999 WL 33541935, at *7 (N.D.N.Y. 1999) (similar).

In sum, the law requires that a responsible government official make a reasoned judgment that it is in the interest of the United States to maintain the confidentiality of the information at issue given the possible harm that the disclosure of that information could cause. The declarants have done so. Their declarations demonstrate that the information "constitute[s] classified material" and present "'reasonably convincing and detailed evidence of a serious risk" of harm "if the redacted information were published." *Shaffer*, 102 F. Supp. 3d at 14 (quoting *McGehee*, 718 F.2d at 1149).

### 2.  Atomic Energy Act

The Atomic Energy Act establishes an independent classification regime to protect a special category of information called "Restricted Data," which is defined to include "all data concerning (1) the design, manufacture, or utilization of atomic weapons; (2) the production of special nuclear material; or (3) the use of special nuclear material in the production of energy," unless such information has been removed from the Restricted Data category or declassified. 42 U.S.C. § 2014(y). Information is determined by the Department of Energy to constitute Restricted Data following an evaluation in accordance with established criteria. *See* 10 C.F.R. § 1045.70.

Restricted Data is not subject to automatic declassification after a period of time under Section 3.3 of Executive Order 13,526. *See* Exec. Order 13,526 § 6.2(a)

Instead, an affirmative decision to declassify Restricted Data must be made by the Department of Energy, the successor agency to the Atomic Energy Commission. 42 U.S.C. § 2162(a).

When the information concerns the military use of atomic weapons, it may be removed from the Restricted Data category only by a joint determination by the Department of Energy and the Department of Defense. 42 U.S.C. § 2162(d); 10 C.F.R. § 1045.45(b)(2). This information, referred to as "Formerly Restricted Data," remains classified and is protected in a manner similar to the national security information governed by Executive Order 13256. 10 C.F.R. § 1045.30. Formerly Restricted Data will be declassified only if the Department of Energy and the Department of Defense jointly determine that it "may be published without undue risk to the common defense and security." *Id.* § 1045.45(b)(4).

The Department of Energy and the Department of Defense jointly prepare a classification guide for Formerly Restricted Data. 10 C.F.R. § 1045.45(d)(4). At the Department of Defense, the Deputy Assistant Secretary of Defense for Nuclear Matters is responsible for working with the Department of Energy on this guide. DoDI 5210.02 ¶ 2.a(1). The classification guide serves as a "written record of detailed instructions … that explicitly identifies whether specific information is classified[.]" 10 C.F.R. § 1045.30. Materials for public release that may potentially contain Formerly Restricted Data are reviewed by a Department of Defense

53

official. *Id.* § 1045.125(b). Using the classification guide, the official determines if information in the materials is classified as Formerly Restricted Data. *Id.* § 1045.130(a).

As set forth in the Classified Appendix, some of the information in Dr. Hopkins's *Klaxon!* manuscript constitutes Formerly Restricted Data and has been determined to be classified under the classification guide. The release of this information would damage the common defense and national security interests of the United States. Accordingly, that information is properly classified.

\* \* \*

Because the redacted portions of Dr. Hopkins's manuscripts are currently and properly classified, and would cause damage to national security if released, the government properly classified this information under Executive Order 13,526 and the Atomic Energy Act. The Court should therefore grant judgment to the Department on Dr. Hopkins's classification challenges.

## CONCLUSION

For these reasons, the Court should grant the Department's motion, dismiss Dr. Hopkins's procedural claims as non-justiciable, and otherwise enter judgment for the Department.

Dated: October 4, 2023                    Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          Principal Deputy Assistant Attorney General

                                          MARCIA BERMAN
                                          Assistant Branch Director

                                          */s/ John T. Lewis*
                                          JOHN T. LEWIS (TX Bar No. 24095074)
                                          LISA NEWMAN (TX Bar No. 24107878)
                                          Trial Attorneys
                                          U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street NW
                                          Washington, D.C. 20530
                                          Tel: (202) 353-0533
                                          Fax: (202) 616-8460
                                          E-mail: john.t.lewis.iii@usdoj.gov

                                          *Attorneys for Defendant*

## CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing brief contains 12,427 words, exclusive of the case caption, table of contents, table of authorities, signature block, and certificates, but inclusive of footnotes, according to Microsoft Word's word-count register.

*/s/ John T. Lewis*
John T. Lewis

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2023, a copy of the foregoing was filed electronically via the Court's ECF system, which effects service upon counsel of record.

*/s/ John T. Lewis*
John T. Lewis
