# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

## Dallas Division

ROBERT HOPKINS, III,             *
                                 *
    Plaintiff,             *
                                 *
    v.                     *       Civil Action No. 3:22-cv-00706 (E)
                                 *
DEPARTMENT OF DEFENSE,           *
                                 *
    Defendant.             *
                                 *
*    *    *    *    *    *    *    *    *    *    *    *    *

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## TO DISMISS AND FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

SHORT STATEMENT ..................................................................................... iv

STATEMENT OF ISSUES .............................................................................. iv

SUMMARY ....................................................................................................... 1

FACTUAL BACKGROUND ............................................................................ 2

    *Klaxon!* ........................................................................................................ 2

    *Crowded Skies* ........................................................................................... 5

    "Searching for Mobile ICBMs" ................................................................ 7

    "Bring Back the Looking Glass?" ............................................................. 8

    "Why 15 Minutes Is Irrelevant" ............................................................... 9

    "Effectiveness of the Alert Force" ......................................................... 10

    "DoD Prepublication Review" ................................................................ 10

    Draft Response .......................................................................................... 11

    Future Plans .............................................................................................. 13

ARGUMENT ................................................................................................... 14

    I.    DOPSR'S MOTION TO DISMISS IS MERITLESS ................. 15

        A.    DOPSR MISREPRESENTS THE RECORD .................... 16

        B.    HOPKINS ASKED FOR MORE THAN REVIEW .......... 21

    II.    THE REDACTED INFORMATION IS UNCLASSIFIED ........ 22

A.  *CROWDED SKIES* .............................................................. 26

B.  *KLAXON!* AND ARTICLES ............................................. 28

III.  HOPKINS WAS HARMED BY RETALIATORY
CENSORSHIP .......................................................................... 29

CONCLUSION ............................................................................. 30

CERTIFICATE OF COMPLIANCE ............................................. 31

## <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                                 **Pages**

*Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362 (4th Cir. 1975) .... ......... ......... 23

*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002) ..... ......... .......... ......... ......... 29

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) ......... .......... ......... ......... 22, 23

*Shaffer v. DIA*, 102 F. Supp. 3d 1 (D.D.C. 2015).... ......... .......... ......... ......... 23, 24

*Snepp v. United States*, 444 U.S. 507 (1980). ......... ......... .......... ......... ......... 22, 23

*Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003) ...... ......... .......... ......... ......... 23

*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) .......... ......... ......... 22, 23

*Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009) .. ......... ......... .......... ......... ......... 23

**Executive Orders:**

Exec. Order 13,526 ......... ......... ......... .......... ......... ......... .......... ......... ......... 27

## SHORT STATEMENT

Defendant has moved to dismiss and for summary judgment. No discovery has been performed.

## STATEMENT OF ISSUES

The primary question before the Court is whether the information redacted by Defendant is currently and properly classified, or whether it has been previously officially disclosed. The standard of review for this question is *de novo*.

The secondary question before the Court is whether Defendant unlawfully retaliated against Plaintiff for exercising his First Amendment rights. The standard of review for this question is *de novo*.

The tertiary question before the Court is whether Defendant violated its own rules. The standard of review for this question is arbitrary and capricious.

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

## Dallas Division

ROBERT HOPKINS, III,        *

                                 *

      Plaintiff,          *

                                 *

      v.                   *     Civil Action No. 3:22-cv-00706 (E)

                                 *

DEPARTMENT OF DEFENSE,  *

                                 *

      Defendant.       *

                                 *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## <u>MOTION TO DISMISS AND FOR SUMMARY JUDGMENT</u>

## <u>SUMMARY</u>

Plaintiff Robert Hopkins, III ("Hopkins") commenced this litigation against the Defense Office of Prepublication and Security Review ("DOPSR")[1] to challenge the unconstitutional prior restraint imposed upon him with respect to documents that he properly submitted for prepublication review, as well as to challenge certain DOPSR policies. After processing the manuscripts, DOPSR filed a dispositive motion on 4 October 2023. After an appeal, Hopkins now files his Opposition.

---

[1] DOPSR is treated herein as the "Defendant."

# FACTUAL BACKGROUND

***Klaxon!***

1.      On 14 December 2020, Hopkins submitted the manuscript for *Klaxon! Strategic Air Command Alert During the Cold War* ("*Klaxon!*") to the U.S. Air Force Office of Public Affairs ("SAF/PA").

2.      On 26 July 2021, SAF/PA completed its review of *Klaxon!* and referred the manuscript to DOPSR because it claimed that the manuscript "involved the equities of other Department components." (Def.'s App'x at 7-8 [hereinafter DA].)

3.      Between 29 July 2021 and 14 January 2022, the undersigned attempted to engage with DOPSR on behalf of Hopkins. His 14 January email concluded, "Please provide me with a detailed status update and an estimate of when we can expect to receive final clearance, or we will have to proceed to litigation."

4.      Unbeknownst to Hopkins, *Klaxon!* was referred by DOPSR to the Joint Staff, the Office of the Assistant Secretary of Defense for Nuclear, Chemical, and Biological Defense Programs, and the United States Strategic Command ("STRATCOM"). (Pl.'s App'x at 27, 29.)

5.      Four STRATCOM Directorates conducted the initial review for STRATCOM: J2 (Intelligence), J3 (Global Operations), J5 (Plans and Policy), and the Historian's Office. (*Id.* at 27.)

6.      Steven Shirley ("Shirley") conducted the initial review of *Klaxon!* for the J3 Directorate. (*Id.*)

7.      Shirley was instructed to identify any classified information or Controlled Unclassified Information ("CUI"), which is unclassified information that the government still limits access to. (*Id.* at 28.)

8.      Shirley identified no classified information or CUI in *Klaxon!*. (*Id.*)

9.      At the time Shirley conducted his review, Shirley reviewed the comments made by the other Directorates. (*Id.*)

10.     Shirley completed his review of *Klaxon!* and submitted his notes in September 2021. (*Id.* at 27.)

11.     Despite the fact that STRATCOM had completed its review, DOPSR never responded to the undersigned with this information.

12.     On 28 February 2022, DOPSR Chief George Sturgis sent the undersigned an email ("Sturgis Email"), stating: "We note that you have submitted several prepublication review requests on behalf of your client, Dr. Hopkins, most recently on January 14, 2022." (DA at 304.)

13.    Sturgis added, "You have indicated that you are the sole correspondent for Dr. Hopkins' submissions, and that DOPSR is not right to administratively close any of the submissions. . . . Failure of the author to correspond with the DoD evades the intent of the prepublication review process to not disclose non-public DoD information." (*Id.*)

14.    Sturgis concluded, "Our insistence on this process is standard DoD policy. . . . Hence, we are closing all of Dr. Hopkins' requests until he contacts our office." (*Id.*)

15.    On 4 March 2022, SAF/PA informed Hopkins that the processing of *Klaxon!* was complete, stating, "The material was assigned a clearance of WITHDRAWN on 04 Mar 2022."

16.    On 27 March 2022, Hopkins filed this case.

17.    On 20 July 2022, DOPSR agreed to review all of Hopkins's manuscripts.

18.    On 30 September 2022, DOPSR completed its processing of the body text of *Klaxon!* and redacted a significant amount of information.

19.    On 31 January 2023, Hopkins, through the undersigned, submitted photos and captions to DOD's counsel to be forwarded to DOPSR, without objection.

20.    On 21 July 2023, Hopkins submitted a draft response intended to assist his undersigned counsel in prosecuting this case ("Draft Response") directly to DOPSR for prepublication review. (PA at 15.) The Draft Response will be discussed in more detail below.

21.    On 9 August 2023, DOPSR completed its processing of the *Klaxon!* photos and captions and redacted a significant amount of information.

22.    On 29 September 2023, DOPSR lifted the redaction of thirteen words.

23.    On 19 October 2023, two weeks after it sought summary judgment, DOPSR lifted the redaction of two sentences.

***Crowded Skies***

24.    On 6 October 2021, Hopkins submitted, through undersigned counsel, the manuscript for his book, *Crowded Skies: Cold War Reconnaissance Over the Baltic* ("*Crowded Skies*"), to DOPSR for prepublication review, even though it was exclusively sourced from publicly released and declassified records.

25.    On 28 February 2022, DOPSR stopped processing *Crowded Skies* pursuant to the Sturgis Email.

26.    On 29 March 2023, DOPSR approved *Crowded Skies* for publication with certain redactions and conditions.

5

27.    DOPSR redacted a moderate amount of text from pages 16-17. (*Id.* at 5-6.) These are the only redactions from *Crowded Skies* being challenged by Hopkins.

28.    On 26 April 2023, Hopkins submitted, through undersigned counsel, a detailed response to DOPSR's determination (*id.* at 17), in which he demonstrated that all of the redacted information was taken from the 2006 article "In the Right Place at the Right Time: US Signals Intelligence Relations with Scandinavia, 1945-1960" ("'In the Right Place'")[2] published in the *Journal of Strategic Studies* by well-respected military intelligence historian Matthew Aid. (*Id.* at 7-14.)[3]

29.    Hopkins directly identified and provided each passage from "In the Right Place" which served as the source of each piece of redacted information. (*Id.* at 7-11.)

30.    Hopkins also provided a list of all of the declassified and unclassified documents cited in "In the Right Place." (*Id.* at 12-14.) These included numerous official foreign government publications, U.S. Government publications, and scholarly works.

---

[2] Hopkins is not including this article in his Appendix for copyright reasons.

[3] For the sole purpose of filing this Opposition, the undersigned has matched the redaction markings from the manuscript, using red redaction markings.

On 24 June 2023, the undersigned submitted this rebuttal to DOPSR's counsel to undergo prepublication review so that he could file it with the Court. DOPSR's counsel advised the undersigned that DOPSR would not review the rebuttal. Hopkins accordingly files this document with the Court after unsuccessfully attempting to have it reviewed.

31.     On 14 June 2023, DOPSR declined to retract any redactions.

**"Searching for Mobile ICBMs"**

32.     On 6 January 2022, Hopkins submitted, through undersigned counsel, a six-page blog article entitled "Searching for Mobile ICBMs" to SAF/PA for prepublication review, even though it was exclusively sourced from publicly released and declassified records.

33.     On 21 January 2022, SAF/PA replied, "We received the security and policy review request on behalf of Mr. [sic] Robert Hopkins; however, the article was forwarded to [DOPSR] for processing. In the future, please forward all of Mr. [sic] Hopkins' submission request[s] directly to DOPSR for security and policy review processing." (*Id.* at 4.)

34.     On 28 February 2022, DOPSR stopped processing "Searching for Mobile ICBMs" pursuant to the Sturgis Email.

35.     On 3 May 2023, DOPSR completed its processing and redacted a significant amount of information.

36.     On 19 October 2023, two weeks after seeking summary judgment, DOPSR lifted the redaction of three words.

**"Bring Back the Looking Glass?"**

37.    On 14 January 2022, Hopkins submitted, through undersigned

counsel, four short articles to DOPSR for prepublication review, even though they

were exclusively sourced from publicly released and declassified records.

38.    The first article submitted on 14 January 2022 was entitled "Bring

Back the Looking Glass? Do We Need 24/7 Airborne Command Posts?" ("'Bring

Back the Looking Glass?'").

39.    In this submission, the undersigned stated, "I am aware that Paul

Jacobsmeyer has claimed that any submission not received directly from the author

will be summarily denied. However, this policy—should it exist—is a violation of

law, and if DOPSR chooses to deny clearance for these submissions based on the

fact that my client has elected to have his lawyer handle the logistics of

prepublication review for his fully unclassified manuscripts, please be aware that

we will pursue all legal avenues at our disposal. Should you desire to meet with my

client to discuss any concerns, I will be happy to facilitate such a discussion, but all

correspondence regarding these submissions must be directed to me." (DA at 301.)

40.    The same day, DOPSR official Tim West ("West") replied to the

undersigned, asking, "Do you have the cover letters for these submissions? We just

need one to make a complete record. Please include contact info, a date you would

the review complete, and a statement that says to the best of your knowledge, it does not contain classified info." (PA at 2.)

41.    The undersigned replied, "Is there a particular form you would like me to use?" West replied, "No form is required. Forms are only for other DoD agencies. Usually, you would use your office letterhead when submitted on anothers [sic] behalf. Any format is ok, we just need it for our records." (*Id.* at 1.)

42.    On 14 January 2022, the undersigned submitted a cover letter regarding "Bring Back the Looking Glass?" to DOPSR. (*Id.* at 3.)

43.    On 28 February 2022, DOPSR stopped processing "Bring Back the Looking Glass?" pursuant to the Sturgis Email.

44.    On 27 March 2023, DOPSR completed its processing and redacted a significant amount of information.

45.    On 19 October 2023, two weeks after seeking summary judgment, DOPSR lifted the redaction of two words.

**"Why 15 Minutes Is Irrelevant"**

46.    The second article submitted on 14 January 2022 was entitled "Why 15 Minutes Is Irrelevant."

47.    On 28 February 2022, DOPSR stopped processing "Why 15 Minutes Is Irrelevant" pursuant to the Sturgis Email.

48.    On 27 March 2023, DOPSR completed its processing and redacted a significant amount of information.

49.    On 19 October 2023, two weeks after seeking summary judgment, DOPSR lifted the redaction of two words.

**"Effectiveness of the Alert Force"**

50.    The third article submitted on 14 January 2022 was entitled "Effectiveness of the Alert Force."

51.    On 28 February 2022, DOPSR stopped processing "Effectiveness of the Alert Force" pursuant to the Sturgis Email.

52.    On 27 March 2023, DOPSR completed its processing and redacted two lines.

53.    On 19 October 2023, two weeks after seeking summary judgment, DOPSR lifted all the redactions and cleared the manuscript for public release.

**"DoD Prepublication Review"**

54.    The fourth article submitted on 14 January 2022 was entitled "DoD Prepublication Review: A Broken, Arbitrary System Predisposed to Rejection" ("'DoD Prepublication Review'").

55.    On 28 February 2022, DOPSR stopped processing "DoD Prepublication Review" pursuant to the Sturgis Email.

10

56.     On 27 March 2023, DOPSR completed its processing and cleared the manuscript for public release.

**Draft Response**

57.     As noted above, on 21 July 2023, Hopkins submitted his Draft Response.

58.     Hopkins's Draft Response was a mostly comprehensive response addressing almost all of DOD's redactions from the various manuscripts included in this case. (*Id.* at 15.)

59.     The Draft Response followed a simple pattern. First Hopkins would indicate the piece of information DOPSR had redacted from a manuscript. Then he would attach an image of the relevant portion of the unclassified and/or officially released document from which he sourced the information. Then he would give a full citation to the source document. (*Id.* at 16.)

60.     For example, if Hopkins had written the sentence "The case was first assigned to Judge Cummings before it was reassigned twice: once to Judge Fitzwater and finally to Judge Brown" on page 25 of one of his manuscripts, and DOPSR had redacted the names of the judges assigned to the case, the relevant section of the Draft Response would have looked like this:

**P. 25 Judges' Names**

> This case was originally before United States District Court Senior Judge Sam R. Cummings. On June 2, 2023, this case was reassigned to United States District Court Senior Judge Sidney A Fitzwater pursuant to Special Order 3-348. (Doc. 19). On June 6, 2023, this case then reassigned to United States District Court Judge Ada E. Brown pursuant to Special Order 3-249. (Doc. 21).

6/13/23 Order, Hopkins v. DOD, No. 3:22-CV-00706-E (N.D. Tex.). (*Id.*)

61.     Virtually everything in the Draft Response was either a summary of redacted material from a manuscript or a pasted image from an unclassified publicly available source and a citation to that source. (*Id.* at 17.)

62.     This means that if one were to redact all the manuscript summaries from the Draft Response, the only substantive information that would be left would be images of unclassified, publicly available documents and the corresponding citations. (*Id.*)

63.     On 23 October 2023, DOPSR informed Hopkins that he was prohibited from providing anything in the Draft Response to the undersigned even though it was almost entirely comprised of screenshots of unclassified or declassified publicly available documents. (*Id.*)

12

64.    On 12 February 2024, Hopkins asked this Court to authorize him to share the Draft Response with the undersigned. (Pl.'s Mot. Auth. His Counsel to Access His Intended Evid., Dkt. #42 (filed Feb. 12, 2024).)

65.    On 4 March 2024, DOPSR filed an opposition to Hopkins's motion, in which it stated that it would "transmit the Draft Response (and/or any other materials Dr. Hopkins wishes to submit) to the Court for its *ex parte*, *in camera* consideration, along with an accompanying classified declaration justifying the Department's objections to the document's release." (Def.'s Opp'n Pl.'s Mot. to Auth. His Counsel to Access His Intended Evid., Dkt. #43, at 3 (filed Mar. 4, 2024) [hereinafter DOPSR's Opp'n to Access].)

66.    On 25 March 2024, this Court dismissed this case, and in doing so denied Hopkins's motion as moot. That order was vacated and remanded by the Fifth Circuit on 14 February 2025, leaving Hopkins's motion for access to the Draft Response unresolved.

**Future Plans**

67.    Hopkins still intends to publish the manuscripts at issue in this case. (PA at 17.) Specifically, the publishers of *Klaxon!* and *Crowded Skies* are waiting for him to provide them with unredacted copies for publication. (*Id.*)

68.    Hopkins has submitted additional manuscripts directly to DOPSR since this litigation has commenced which should have properly been reviewed by

SAF/PA, and he will need to continue to do so absent relief from this Court authorizing him to submit them to SAF/PA. (*Id.*)

69.    Hopkins has submitted additional fully unclassified manuscripts directly to DOPSR since this litigation commenced which he should have been able to submit through counsel, and he will need to do so absent relief from this Court authorizing him to submit fully unclassified manuscripts through counsel. (*Id.*)

## **ARGUMENT**

This case is, at its core, about censorship, but unlike most prepublication review cases, the censorship on display here took a variety of forms. First, there was the straightforward censorship: redacting unclassified, publicly available information and falsely claiming it is classified when challenged. But there was also the *retaliatory* censorship, where the agency retaliated against an author who dared to criticize it and threaten litigation by cancelling its pending reviews of all of his manuscripts. Where the agency decided that it must teach the author a *lesson* about refusing to adhere to the agency's arbitrary and, in some cases, entirely made-up rules. Where the agency told the author that he *must* submit all manuscripts to the office that took the longest time to review manuscripts and refused to work with his lawyer, with no exception. But neither of these forms of censorship is legal, and the Court should resolve this matter quickly so that the

parties can actually *intelligently* argue the merits of the case on a level playing field.

## I.    DOPSR'S MOTION TO DISMISS IS MERITLESS

The Court can dispose of DOPSR's motion to dismiss relatively quickly, for three reasons. First, according to this Court's Standing Order, a party may not file a motion to dismiss without "first confer[ring] with opposing counsel concerning the proposed deficiencies and the expected basis of the Motion." Procedures for Cases Assigned to Dist. J. Ada Brown & Standing Order § II(C)(1). This allows a plaintiff to cure the perceived infirmities without burdening the Court with unnecessary briefing; in fact, according to the Order, "[t]he Court *will* strike any Federal Rule 12(b) Motion to Dismiss if it does not contain the required Certificate of Conference." *Id*. § II(C)(3) (emphasis added). DOPSR's counsel never conferred with the undersigned prior to filing its motion to dismiss, and its motion included no such Certificate of Conference. The Standing Order is clear that this means that the Court *will* strike a motion which does not comply, so the Court's choice is clear.

However, even in the absence of the Standing Order, DOPSR's motion to dismiss has been rendered moot by Hopkins's cross-motion for leave to file an amended complaint. DOPSR's counsel even admitted that "[a]mending the complaint *would moot the government's long-pending motion to dismiss*." (Pl.'s

Cross-Mot. Leave File Am. Compl., Dkt. #71, at 5 (filed Apr. 11, 2025) (emphasis added).) While DOPSR does admittedly maintain that amendment would be futile (*id.*), that is a question to be answered in the briefing of *that* motion, not *this* Motion. Therefore, Hopkins will not discuss it further herein.

Lastly, however, is the fact that the complaint does not *need* to be amended to survive a motion to dismiss. DOPSR basically argues that the case needs to be dismissed because the agency eventually reversed its position and reviewed the manuscripts, and that all of the improper practices it did getting to that point should just be ignored. Then it argues that there is nothing for the Court to adjudicate because the improper practices themselves do not really exist, taking some substantial creative liberties with the record. But none of this is correct.

## A.    DOPSR MISREPRESENTS THE RECORD

Working backwards, it is important—both for the motion to dismiss and the motion for summary judgment—to contrast what SAF/PA and DOPSR told Hopkins and what DOPSR now tells this Court, because the two cannot be reconciled. Hopkins will accordingly briefly address these misrepresentations in roughly the order in which they appear in DOPSR's brief.

First, DOPSR states that, after receiving "Searching for Mobile ICBMs," SAF/PA "instructed Dr. Hopkins's counsel to refer requests of similar subject matter to DOPSR in the future." (DA at 10.) It cites as further support for this

claim its counsel's email to the undersigned: "DoD wanted to make clear that Dr. Hopkins, and not his attorney or any other third-party, may submit future publications directly to SAF/PA pursuant to AFI35-101, but that SAF/PA may refer such publications to DOPSR if the publications concern DoD entities that are not under Air Force control, or if any of the criteria in DoDI 5230.29, Enclosure 3, Section 1 are satisfied." (*Id.* at 2, 13.)

As noted above, these qualified statements simply do not reflect the unequivocal nature of the instruction given by SAF/PA. SAF/PA's email contained no such limiting modifiers as "of similar subject matter," and it very clearly stated, "In the future, please forward *all of Mr. [sic] Hopkins' submission request[s]* directly to DOPSR for security and policy review processing." (*Id.* at 4 (emphasis added).) This is a significant difference, and the fact that DOPSR did not even include this email in its Appendix is very telling.

Similarly, SAF/PA did *not* advise the undersigned that "his attorney or any other third-party" was prohibited from submitting manuscripts to SAF/PA on his client's behalf; in fact, SAF/PA had no problem with the practice and had accepted several manuscripts from the undersigned on behalf of Hopkins. The dispute between Hopkins and SAF/PA was solely about what manuscripts got referred to DOPSR, not who submitted them to SAF/PA in the first place.

17

The second major misrepresentation fits the same model: a) a DOD component tells Hopkins that he has to follow a rule; b) Hopkins challenges the rule in court; c) DOD claims that the rule does not exist. Here, DOPSR contends, "Nor does the Department maintain an official policy of administratively closing any requests for prepublication review submitted by an attorney on behalf of an author . . . . Again, the Department simply administratively closed *Dr. Hopkins's* requests until such time as it could securely correspond with him about the classified information in his manuscripts." (Def.'s Br. Supp. Mot. Dismiss & Summ. J., Dkt. #32-1, at 24-25 (filed Oct. 4, 2023) (cleaned up) [hereinafter DOPSR's Mem.].) However, Sturgis himself stated that DOPSR's "insistence on this process [excluding attorneys] *is standard DoD policy*." (DA at 304 (emphasis added).) While there is now a question of whether this policy actually exists (*see* PA at 43 ("I am not aware of this 'standard DoD policy.'")), for the purposes of a motion to dismiss it suffices to say that the Sturgis Email is in the record and DOPSR's later denials are not. However, a finding that this policy does not exist does not absolve DOPSR of liability, because if Sturgis falsely claimed a "standard DoD policy" to justify closing Hopkins's requests after his attorney pushed back, that suggests improper retaliatory intent.

In a similar vein, DOPSR later attempts to argue, "But the Department did not categorically decline to work with his counsel; it declined to communicate

directly with his counsel regarding the substance of his manuscripts which, the
Department concluded, contained *classified information*." (DOPSR's Mem. at 33;
*see also id.* at 35 (referring to "Hopkins's assertion that the Department was
required to communicate with his counsel regarding classified information in his
manuscripts" in an attempt to "forc[e] the Department to provide classified
information to a private attorney").) However, the record shows that the
undersigned emailed DOPSR, "Should you desire to meet with my client to discuss
any concerns, I will be happy to facilitate such a discussion, but all correspondence
regarding these submissions must be directed to me." (DA at 301.) At no point did
the undersigned insist on discussing classified information with DOPSR, but only
arranging the logistics of the review so that DOPSR could discuss any concerns
with Hopkins. This pushback was unacceptable to DOPSR, and it closed all of
Hopkins's reviews as a result; only after it has been sued does it attempt to argue
that it was taking a principled stand to protect classified information.

    This conclusion is inescapable even if the Court discounts the argument
above, due to the simple fact that this claim cannot be reconciled with the
manuscripts themselves. The Court need simply consider the question, if DOPSR
only refused to communicate with Hopkins's counsel about *classified information*,
and it only closed its reviews when Hopkins's counsel would not comply, why did
it close its review of "DoD Prepublication Review," which it concluded contained

no classified information *the first time it actually read it*? More generally, why did it close its reviews of *all* of Hopkins's manuscripts, including the ones it had not even begun to review yet? (*See* DA at 297 (stating DOPSR will not provide "acknowledgement of the manuscript" until Hopkins contacted it directly).) The answer is clear: DOPSR was not refusing to substantively discuss classified information with the undersigned; it was refusing to discuss *any* information with the undersigned or even review documents which did not even *require* discussions, all because Hopkins had challenged its arbitrary orders. That is prohibited retaliation.

DOPSR's last misrepresentation is a similar attempt to rewrite history, but now to take credit for actions it took after Hopkins filed suit. DOPSR states, "When the Department became confident that it could continue the review process without sanctioning those exposures or risking further ones, it promptly resumed doing so, and ultimately completed its review of every publication submitted by Dr. Hopkins." (DOPSR's Mem. at 33.) In making this self-congratulatory claim, DOPSR leaves out the fact that it only "resumed doing so" after Hopkins filed this litigation and the Court ordered the parties to mediate.

However, even this claim proves that DOPSR's actions were not about preventing the release of classified information; it was about not "sanctioning those exposures" that Hopkins had allegedly made by allowing his lawyer to submit the

20

manuscripts. DOPSR was *punishing* Hopkins for not doing what it said, and it did not matter whether the information turned out to be classified or not; it only mattered that Hopkins and his lawyer must be *taught a lesson*. And while DOPSR is authorized to do many things, punishing authors is not one of them. As Sturgis stated, if a person provides classified information to an unauthorized party, the solution is "an Unauthorized Disclosure investigation by the Defense Counterintelligence and Security Agency." (DA at 304.) DOPSR cannot on its own refuse to process manuscripts because it disagrees with how they were submitted. That is beyond its authority, and doing so is arbitrary, capricious, and contrary to law, as well as retaliatory.

**B.    HOPKINS ASKED FOR MORE THAN REVIEW**

By far the weakest argument in DOPSR's Motion is the contention that all Hopkins asked the Court to do was make DOPSR review his manuscripts. This argument requires the Court to ignore the repeated statements in the Complaint that DOD's actions "impermissibly infringed upon Hopkins's right to publish unclassified information." (Compl., Dkt. #1, ¶¶ 119, 131, 143, 155, 167, 179, 191 (filed Mar. 27, 2022) (once per manuscript).) More importantly, it requires the Court to ignore the *first two prayers for relief*: "Permanently enjoin the Department of Defense from restraining the publication of any portion of unclassified text within the seven documents discussed herein; [and] Declare and

21

find that the seven documents discussed herein are unclassified in their entirety." (*Id.* at 36.) If Hopkins were asking the Court simply to order DOPSR to "do something," then there would be no reason for the Court to even *consider* if information was classified or not; that determination would signal the end of the case.

In short, even if the Court allows DOPSR to violate its Standing Order with impunity, and even if it ignores Hopkins's cross-motion to amend, it *still* cannot grant DOPSR's motion to dismiss because the initial Complaint satisfies the standard.

## II.    THE REDACTED INFORMATION IS UNCLASSIFIED

Hopkins concedes—as a former holder of a security clearance and an authorized holder of access to classified information—that he lacks the right to publish any properly classified information. *See Snepp v. United States*, 444 U.S. 507, 510 (1980). However, it is well-settled that secrecy agreements, such as those executed by Hopkins over the course of his federal career, do not extend to "unclassified materials or to information obtained from public sources." *McGehee v. Casey*, 718 F.2d 1137, 1148-49 (D.C. Cir. 1983). The government may not censor such material, "contractually or otherwise." *United States v. Marchetti*, 466 F.2d 1309, 1313 (4th Cir. 1972). "[A]ny secrecy agreement which purports to prevent disclosure of unclassified information would contravene First Amendment

rights." *Id.* at 1317. *See also Snepp*, 444 U.S. at 513 n.8 ("[I]f in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned."); *Wilson v. CIA*, 586 F.3d 171, 185 (2d Cir. 2009) ("The government has no legitimate interest in censoring unclassified material."); *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) ("If, on the other hand, the information was not classified properly, then Stillman may publish the manuscript."); *Shaffer v. DIA*, 102 F. Supp. 3d 1, 9 (D.D.C. 2015) ("Nonetheless, when a manuscript contains information that is unclassified, wrongly-classified, or derived from public sources, the Government may not censor such material.").

Hopkins "has a strong first amendment interest in ensuring that [DOPSR] censorship of his [manuscripts] results from a *proper* classification of the censored portions." *McGehee*, 718 F.2d at 1148. As the Fourth Circuit noted fifty years ago, "the deletion items should be suppressed only if they are found to be both classified and classifiable under the Executive Order." *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1367 (4th Cir. 1975).

In light of this persuasive and long-accepted case law, DOPSR has no legitimate grounds for redacting the information in controversy in this case. However, due to the complex procedural posture of this case, the discussion of how each manuscript was wrongly handled differs slightly. The one factor that they all have in common is the fact that, even if the information was originally

classified (which Hopkins generally does not dispute), it is no longer classified because it has been previously officially disclosed.

As an initial matter, however, DOPSR's handling of this question has demonstrated its gamesmanship in this case. Rather than make its arguments for why the information was not officially disclosed so that the Court could have the benefit of an informed debate, DOPSR instead states that "the Department will respond to these arguments more fully when presented with Dr. Hopkins's opposition brief." (DOPSR's Mem. at 47.) It explains that it is doing so because "[a] plaintiff asserting a claim of prior disclosure bears the 'initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.'" (*Id.* (quoting *Shaffer*, 102 F. Supp. 3d at 9).) This is an oversimplification of the history of this case, however.

Simply put, the relevant case law does not require that the party asserting the claim bears the burden of showing official disclosure *in a brief*. The standard is that the party bears the burden of showing official disclosure, *period*. In this case, Hopkins did so long before DOPSR filed its motion. First he submitted a detailed rebuttal regarding *Crowded Skies* to DOPSR on 26 April 2023 (PA at 17), and then he submitted a detailed Draft Response regarding the other manuscripts on 21 July 2023 (PA at 15.) By the time DOPSR wrote its brief, it had been in possession of these rebuttals for several months and knew exactly what the claims were that

Hopkins was making; it even issued a final response to the *Crowded Skies* rebuttal four months before filing its Motion.

Despite knowing *with particularity* where Hopkins had sourced practically every piece of redacted information in controversy for months, DOPSR recognized that it had a significant advantage in this case, because *the undersigned* did not know what Hopkins had written, at least as far as the Draft Response goes. So it decided to play coy and argue that it simply needed to wait to see what Hopkins's counsel wrote *in this brief* before it could respond to these claims. Meanwhile, DOPSR gave away the game when it promised to respond to the Draft Response in its Reply. (DOPSR's Opp'n to Access at 3.) If DOPSR is able to respond to the Draft Response in its Reply without the undersigned having read it, then it was able to respond to the Draft Response *in its opening brief*. It simply chose not to in order to obtain a litigation advantage, but in doing so it overreached, because every sworn declaration it filed stating that the information remained currently and properly classified was written with full knowledge of the countervailing evidence.

An example of such overreach can be seen on the public record. On 21 July 2023, Hopkins submitted the Draft Response to DOPSR. On 4 October 2023, DOPSR filed its motion, including sworn declarations stating under oath that all of the redacted information was currently and properly classified. On 19 October 2023, DOPSR lifted redactions from *Klaxon!*, "Searching for Mobile ICBMs,"

"Bring Back the Looking Glass?," "Effectiveness of the Alert Force," and "Why 15 Minutes Is Irrelevant." In other words, it removed redactions from every manuscript in controversy except the one it had previously cleared in its entirety ("DoD Prepublication Review") and the one that the Draft Response did not address (*Crowded Skies*). Despite this tacit admission that its declarants had erroneously stated under oath that the newly unredacted information remained currently and properly classified, DOPSR filed no correction with the Court or otherwise indicated that its witnesses had offered false testimony; it just waited for the Court to rely on those declarations and rule in its favor. The Court should not reward this transparent gamesmanship any further.

### A.    *CROWDED SKIES*

The case of *Crowded Skies* is the most straightforward for two reasons. First, a very small amount of information is in controversy. Second, the undersigned is able to argue specifically about those redactions.

Virtually all of the information redacted from pages 16-17 of *Crowded Skies* was clearly redacted to obscure the identities of the three Scandinavian countries being discussed, which, as Hopkins's rebuttal reveals, were publicly known and acknowledged. In fact, it is noteworthy that DOPSR did *not* redact the fact that "US intelligence collaboration" with two of the countries "was relatively overt," citing the facts that: (1) they were members of the North Atlantic Treaty

Organization ("NATO"); (2) they hosted U.S. military bases; and (3) "they had little reluctance in sharing operational and intelligence information with their American benefactor." (PA at 6.) Coupled with the fact that DOPSR also did not redact the immediately following sentence that "Sweden, *conversely*, sought to preserve its public image of *alliansfrihet* or 'freedom from alliances in peace, neutrality in case of war'" (*id.* (emphasis added)), it is difficult to understand exactly what 70-year-old properly classified secrets DOPSR believes it is protecting by redacting this information (especially since, prior to 2022, only three Scandinavian countries were in NATO: Denmark, Norway, and Iceland).

Furthermore, the age of this information is itself dispositive of this case, since, according to the governing Executive Order, E.O. 13,526, all information "shall be automatically declassified on December 31 of a year that is no more than 50 years from the date of origin" unless it is related to a confidential human source, a human intelligence source, or weapons of mass destruction. Exec. Order 13,526 § 3.3(h). The information redacted by DOPSR from *Crowded Skies* fails to satisfy any of these criteria, and therefore it is no longer properly classified, even assuming that it ever was.

Once the Court compares Hopkins's response to pages 16-17 of *Crowded Skies*, Hopkins is confident that the result of that comparison will be a denial of DOPSR's motion.

27

### B.    *KLAXON!* AND ARTICLES

Hopkins can only make indirect arguments regarding *Klaxon!* and the three redacted articles because, as noted above, the undersigned has not reviewed the Draft Response. However, when the Court compares the Draft Response to DOPSR's evidence, it will see clearly that this information cannot be legitimately censored and that DOPSR has overplayed its hand.

With specific respect to *Klaxon!*, the Court has the benefit of an additional compelling authority. Not only does the author demonstrate that the information is not properly classified, but one of the *reviewers* does as well. Steven Shirley ("Shirley") conducted the review of *Klaxon!* for the STRATCOM J3 Directorate (Global Operations). (PA at 27.) Shirley testifies that he was directed to redact not only classified information but CUI as well, and that this was a normal practice. (*Id.*) Shirley further testifies that even with that low bar, he found nothing to redact, because "[a]ll of the information in this manuscript was taken directly from unclassified Strategic Air Command documents, Department of Defense social media posts, and similar publicly available sources." (*Id.*) Shirley finally testifies that the people who *did* redact information likely did so because "[m]any of the people working in these programs are not aware that much of the information that was classified during the Cold War has since been declassified, and so they erroneously continue to treat it as classified because it was classified when they

28

last worked with it." (PA at 29.) This explicit testimony from a person with direct knowledge of the review of *Klaxon!* and unimpeachable subject matter expertise is more than sufficient to establish a genuine issue of material fact.

Additionally, Shirley states, "If I am given access to the unredacted manuscript by the Court I will be able to easily explain why the information is not currently and properly classified as well as why the entity responsible for each redaction (which I can identify for the Court with specificity) was wrong to redact the information." (PA at 30.) Should the Court deny DOPSR's Motion, Hopkins will request that the Court authorize such access so that it can have the benefit of the informed opinion of an expert with personal knowledge to counterbalance the self-serving declarations offered by DOPSR.

## III.    HOPKINS WAS HARMED BY RETALIATORY CENSORSHIP

On the question of retaliation for First Amendment activity (which does allow for damages, notwithstanding DOPSR's focus on the Administrative Procedure Act), DOPSR takes the curious position that a plaintiff can only be harmed if he was chilled, which is not the standard. The better question is, was what DOPSR did to Hopkins different, and would a "person of ordinary firmness," *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002), have been chilled by it? The answer to both questions is yes.

To the first question, national security lawyer Mark Zaid ("Zaid") testifies that it is not uncommon for lawyers to correspond with prepublication review offices on their clients' behalf. (PA at 39.) Zaid testifies that he has participated in many discussions about logistics and arranged for meetings, which he does not attend. (*Id.* at 41.) Zaid even added that he "generally require[s]" that he handle the logistics. (*Id.* at 42.) Zaid concluded that he was unaware of the "standard DoD policy" that Sturgis cited, further supporting the claim that DOPSR's actions were retaliatory and targeted. (*Id.*)

To the second question, all the Court need ask is, would an ordinary author be chilled by having all of their reviews summarily closed in retaliation for challenging the review process? The fact that Hopkins possessed "uncommon firmness" is a testament to his character, not a weakness in his case.

As one last point which fits nowhere else, it is important to note that contrary to DOPSR's unsupported speculation, Hopkins did not learn any of the redacted information during his government employment. He learned it all from public sources after his retirement. (*Id.* at 17.)

## <u>CONCLUSION</u>

The Court should deny DOPSR's dispositive Motion.

Date: April 15, 2025

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
N.D. Tex. Bar #984704DC
National Security Counselors
1451 Rockville Pike
Suite 250
Rockville, MD  20852
501-301-4672
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing filing contains 6243 words.

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.

31