**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

**Dallas Division**

| | | |
|---|---|---|
| ROBERT HOPKINS, III, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 3:22-cv-00706 (E) |
| | * | |
| DEPARTMENT OF DEFENSE, | * | **Jury Trial Requested** |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * *

## FIRST AMENDED COMPLAINT

Plaintiff Robert Hopkins, III, brings this action against Defendant Department of Defense pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, the All Writs Act, 28 U.S.C. § 1651, and the First Amendment to the Constitution of the United States.

## JURISDICTION

1. This Court has both subject matter jurisdiction over this action and personal jurisdiction over Defendants pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

## VENUE

2. Venue is appropriate under 5 U.S.C. § 703 and 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff Robert Hopkins, III ("Hopkins") is a U.S. citizen and a resident of the State of Texas.

4. Defendant Department of Defense ("DOD") is an agency within the meaning of 5 U.S.C. § 701 and subject to the jurisdiction of this Court. DOD's actions have unreasonably delayed and prevented Hopkins from publishing his intended manuscripts, as well as interfering with his attorney-client relationship with his undersigned counsel.

5. The United States Air Force Office of Public Affairs ("SAF/PA") and Defense Office of Prepublication and Security Review ("DOPSR") are DOD components.

## BACKGROUND

### *PART I: PREPUBLICATION REVIEW IN GENERAL*

6. Any person who possesses a security clearance to access classified national security information must sign a Non-Disclosure Agreement ("NDA") agreeing, *inter alia*, to submit any documents related to his/her national security employment for prepublication review before publishing them.

7. The two most common NDAs for classified information are the SF-312 (governing all classified information) and Form 4414 (governing a subset known as Sensitive Compartmented Information).

8. An author generally submits a document to the agency which sponsors (or sponsored) his/her security clearance.

9. Each agency generally has a specific office responsible for conducting prepublication review, although prepublication review is often not the sole responsibility of such an office.

10. For example, DOPSR is responsible for coordinating prepublication review across DOD, but it does not perform any review itself. The DOD prepublication review system is primarily governed by DOD Instruction ("DODI") 5230.09, *Clearance of DoD Information for Public Release*, and DODI 5230.29, *Security and Policy Review of DoD Information for Public Release*.

11. SAF/PA is responsible for conducting prepublication review for the United States Air Force ("Air Force"). In addition to the DOD authorities listed above, the Air Force prepublication review system is primarily governed by Air Force Instruction ("AFI") 35-101, *Public Affairs Operations*, Chapter 9; AFI 35-102, *Security and Policy Review Process*; and Air Force Manual ("AFMAN") 35-101, *Public Affairs Procedures*, Chapter 8.

12. The standard operating procedure for current and former Air Force personnel is to submit manuscripts to SAF/PA, which will usually complete its prepublication review within approximately two weeks.

13. If SAF/PA determines that the manuscript requires coordination with other DOD components or other agencies, it may refer the manuscript to DOPSR after completing its review. Otherwise it will issue a response to the author granting permission to publish all or part of the manuscript or denying permission to publish any information.

14. SAF/PA will also refer a manuscript to DOPSR if it: "a. Originates or is proposed for release in the National Capital Region by senior personnel (e.g., general or flag officers and Senior Executive Service) on sensitive political or military topics; b. Is or has the potential to become an item of national or international interest; c. Affects national security policy, foreign relations, or ongoing negotiations; d. Concerns a subject of potential controversy among the DoD Components or with other federal agencies; e. Is presented by a DoD employee who, by virtue of rank, position, or expertise, would be considered an official DoD spokesperson; or f. Contains technical data" ("3-1 Criteria").[1]

15. If an author knows in advance that a manuscript will require coordination with several DOD components or meets one of the 3-1 Criteria, the author may submit the manuscript directly to DOPSR. DOPSR will not complete

[1] This is not a standard term; it is used herein purely for convenience to indicate that the criteria appear in DODI 5230.29, Enclosure 3, Section 1.

its prepublication review in fewer than sixty days, and it maintains that it is not required to complete its review within any set time limit.

16. After DOPSR completes its coordination with any DOD components that it deems relevant to a manuscript, it will issue a response to the author granting permission to publish all or part of the manuscript or denying permission to publish any information.

17. Manuscript submissions to SAF/PA must be accompanied by a standardized form. Manuscript submissions to DOPSR must be accompanied by a cover letter, although there is no standardized format.

18. Both SAF/PA and DOPSR perform a two-step review of submitted manuscripts—identified as "security review" and "policy review"—although the scope of review differs subtly between the components.

19. According to SAF/PA, "The purpose of the security review is to protect classified information, controlled unclassified sensitive information, or unclassified information that may individually or in aggregate lead to an unauthorized disclosure or controlled unclassified information which can adversely impact national and operational security. The purpose of the policy review is to ensure no conflict exists with established AF, DoD, or other U.S. Government agency policies."

20. Upon information and belief, SAF/PA conducts both types of review of all submitted manuscripts.

21. According to DOPSR, "The security review protects classified information, controlled unclassified information, or unclassified information that may individually or in aggregate lead to the compromise of classified information or disclosure of operations security. The policy review ensures that no conflict exists with established policies or programs of the DoD or the U.S. Government."

22. Upon information and belief, DOPSR conducts both types of review of manuscripts submitted by current DOD employees, but only conducts a security review of manuscripts submitted by former DOD employees.

23. It is not uncommon for authors to be represented by counsel during the prepublication review process, both in DOD and across the Executive Branch. It is common for such counsel to submit their clients' manuscripts for prepublication review and correspond with the respective prepublication review offices on their clients' behalf, especially if the client has no reason to believe the manuscript contains any classified information.

24. The undersigned and other private attorneys who represent authors have submitted clients' manuscripts for prepublication review to various agencies and represented those clients in the prepublication review process without objections from the agencies.

## ***PART II: HOPKINS'S MANUSCRIPTS BEFORE LITIGATION***

### Background

25. From 1983-1991, Hopkins served in the Air Force. He was honorably discharged in 1991 with the rank of Captain. At the time of his discharge, Hopkins had a Top Secret security clearance with access to Sensitive Compartmented Information, colloquially known as a "TS/SCI clearance."

26. In 1998, Hopkins received a Ph.D. in U.S. History from the University of Virginia, with a focus on national security history.

27. In 2016, Hopkins published an updated version of his Ph.D. dissertation as *Spyflights and Overflights: US Strategic Aerial Reconnaissance Vol. I: 1945-1960*.

28. Because Hopkins had written this book using exclusively public and declassified records, he did not submit the manuscript for prepublication review, since Air Force official guidance stated that "former members and retired personnel" were "encouraged" but not required to submit manuscripts for prepublication review.

29. Hopkins did submit the manuscript for his second book to SAF/PA for prepublication review because it contained technical data, and SAF/PA cleared it for public release.

30. An unknown person falsely reported Hopkins in late 2018 or early 2019 to the Air Force Office of Special Investigations ("OSI") for allegedly including classified information in the then-unpublished manuscript for his third book, *Strategic Air Command in the UK: SAC Operations 1946-1992* ("*SAC in the UK*"). When he discussed the manuscript with an Air Force Judge Advocate General officer in March 2019, she confirmed that as long as he was no longer an active duty or reserve officer and used only public domain material, he was not obligated to submit his manuscripts for prepublication review.

31. OSI did not find any wrongdoing on Hopkins's part.

32. On 20 August 2019, Hopkins nonetheless voluntarily submitted, through undersigned counsel, the *SAC in the UK* manuscript to SAF/PA official Carolyn Oredugba ("Oredugba") for prepublication review, even though it was, like his other manuscripts, exclusively sourced from publicly released and declassified records. Oredugba, who has been consistently identified as the official SAF/PA point of contact for prepublication review matters, corresponded with the undersigned about this submission without objection.

33. The version of the *SAC in the UK* manuscript submitted to SAF/PA was substantively identical to the version in which Hopkins had been falsely accused of including classified information.

34. On 29 August 2019, Oredugba informed the undersigned, "The manuscript for your client, Dr Hopkins, has been cleared for public release."

35. On 16 December 2019, Hopkins published *SAC in the UK*.

**Manuscripts Submitted to SAF/PA**

***1. Klaxon!***

36. On 14 December 2020, Hopkins personally submitted the manuscript for his fourth book, *Klaxon! Strategic Air Command Alert During the Cold War* ("*Klaxon!*"), to Oredugba—with a copy to her associate Beverly Sumpter ("Sumpter")—for prepublication review, even though it was, like his other manuscripts, exclusively sourced from publicly released and declassified records.

37. *Klaxon!* did not require coordination with other DOD components or meet any of the 3-1 Criteria.

38. Hopkins did not receive an "undelivered mail" message from either Oredugba or Sumpter.

39. Neither Oredugba nor Sumpter responded to Hopkins for over six months.

40. On 8 July 2021, the undersigned contacted Oredugba about *Klaxon!*. He stated, "There appears to have been some breakdown in the process, as [Hopkins] has informed me that he attempted to contact the appropriate offices several months ago but received no response. Because his publisher's deadline is

fast approaching, we would respectfully request a quick review of this, especially given his history of publishing unclassified material and the bibliography he has provided (and the comparatively short length of the book). Since we don't know what happened to the previous attempts, I've refilled out the submission form, dated today."

41. Twelve minutes later, Oredugba acknowledged the submission of *Klaxon!* but stated that "due to the content of his manuscript, it will also need to be reviewed by [DOPSR]."

42. Over the course of several emails, Oredugba claimed that neither she nor Sumpter had a record of receiving Hopkins's 14 December 2020 email. She stated that she would not reconsider her determination that a referral to DOPSR was appropriate, yet also prohibited the undersigned from submitting the manuscript directly to DOPSR to save time, stating, "The AF will review the manuscript and then I will forward to DOPSR for review. DOPSR will not review the manuscript until the Air Force has reviewed the document." At no point did she object to corresponding with the undersigned about the matter instead of Hopkins.

43. On 26 July 2021, SAF/PA completed its review of *Klaxon!* and referred the manuscript to DOPSR.

44. On 29 July 2021, the undersigned emailed a senior DOD attorney about *Klaxon!*, attempting to resolve the matter quickly so that Hopkins would not

miss his publishing deadline. He reiterated that the manuscript was exclusively sourced from publicly released and declassified records, that the sources were explicitly identified, that Hopkins had a history of writing such books based solely on such sources, and that the subject matter of the book was the same as *SAC in the UK*, which had not required referral to DOPSR.

45. The DOD attorney replied that "DOPSR's assessment is that the contents include subject matter of interest to at least two DoD components, which requires a referral to those organizations for review." He stated that DOPSR would expedite the process and then referred the undersigned to Alci Ortiz ("Ortiz"), stating, "He should be your point of contact for further questions and can help check on the status of the review, if necessary."

46. On 5 August 2021, Ortiz informed the undersigned that DOPSR had referred *Klaxon!* to three DOD components, which he refused to identify.

47. On 1 September 2021, the undersigned emailed Ortiz, "Please provide an update, as it has been 30 days. How many components have completed their review, how many are left, when we can expect a final response, etc." Ortiz did not respond.

48. On 6 October 2021, the undersigned emailed Ortiz, "Sir, I have not yet received a response to this request. It has now been more than 60 days, and

more than 30 days from my last attempt to obtain information from you." Ortiz did not respond.

49. On 14 January 2022, the undersigned emailed Ortiz, with a CC to the senior DOD attorney, "Mr. Ortiz, it has now been almost six months since the AF gave a copy of my client's book to DOPSR and you told me it was being referred to 3 components, and [the senior DOD attorney] said that DOPSR was willing to expedite the process. Since then I have attempted to get status updates from you twice, with no response, and DOPSR has not said a single word to us about this manuscript. This manuscript was explicitly sourced from public documents and should not have taken a small fraction of this much time to review. Please provide me with a detailed status update and an estimate of when we can expect to receive final clearance, or we will have to proceed to litigation."

50. Neither Ortiz nor the senior DOD attorney ever responded to the above messages.

51. On 28 February 2022, DOPSR Chief George Sturgis ("Sturgis") sent the undersigned an email ("Sturgis Email") which will be discussed in greater detail in paragraphs 70-73 below, which stated in pertinent part that DOPSR was "closing all of Dr. Hopkins' requests until he contacts [its] office."

52. On 4 March 2022, SAF/PA informed Hopkins that the processing of *Klaxon!* was complete, stating, "The material was assigned a clearance of WITHDRAWN on 04 Mar 2022."

53. Hopkins did not withdraw *Klaxon!*. Upon information and belief, DOPSR appears to have falsely informed SAF/PA that the manuscript was withdrawn as a result of the Sturgis Email.

***2. "Searching for Mobile ICBMs"***

54. On 6 January 2022, Hopkins submitted, through undersigned counsel, a six-page blog article entitled "Searching for Mobile ICBMs" to Oredugba for prepublication review, even though it was, like his other manuscripts, exclusively sourced from publicly released and declassified records.

55. "Searching for Mobile ICBMs" did not require coordination with other DOD components or meet any of the 3-1 Criteria.

56. On 14 January 2022, after receiving no response from Oredugba, the undersigned emailed her, "Please confirm receipt of this email. I am concerned by your silence in light of the fact that you claimed not to receive my client's last submission."

57. On 21 January 2022, Oredugba replied, "We received the security and policy review request on behalf of Mr. [sic] Robert Hopkins; however, the article was forwarded to [DOPSR] for processing. In the future, please forward all of Mr.

[sic] Hopkins' submission request[s] directly to DOPSR for security and policy review processing."

58. DOPSR stopped processing "Searching for Mobile ICBMs" pursuant to the Sturgis Email.

**Manuscripts Submitted to DOPSR**

***1. Crowded Skies***

59. On 6 October 2021, Hopkins submitted, through undersigned counsel, the manuscript for his fifth book, *Crowded Skies: Cold War Reconnaissance Over the Baltic* ("*Crowded Skies*"), to DOPSR for prepublication review, even though it was, like his other manuscripts, exclusively sourced from publicly released and declassified records.

60. Notably, *Crowded Skies* dealt with significantly different subject matter than *Klaxon!* except for a few tangential references, specifically with respect to the fact that intelligence collected by reconnaissance missions over the Baltic—the subject matter of *Crowded Skies*—would be used in support of Strategic Air Command alert missions—the subject matter of *Klaxon!*—if any were launched.

61. The submission email did not include a cover letter because neither the undersigned nor Hopkins had been informed by that time that one was necessary. The undersigned, however, stated in the email, "Normally these are

submitted directly to the USAF, but since we already know that it contains US Navy equities, we are submitting it directly to DOPSR for coordination between the different offices."

62. On 18 October 2021, DOPSR official Paul Jacobsmeyer ("Jacobsmeyer") replied to the undersigned, acknowledging receipt of the *Crowded Skies* submission. Jacobsmeyer, however, stated, "DOPSR does not work with, or accommodate, publishers' timelines, nor do we work with an author's legal counsel or literary representative. Please have the author contact us directly with appropriate contact information, and we will provide him/her with an acknowledgement of the manuscript. Failure to provide this information will result in the denial of Security Review of this manuscript and administrative closure of this case."

63. On 23 November 2021, Jacobsmeyer emailed the undersigned, "As we have received no response to our request below soliciting contact information with the author of the subject manuscript, DOPSR is closing the case and taking no further action. Subsequent re-submission of the case will result in a new case number and position in the queue for the author."

64. On 14 January 2022, Hopkins submitted, through undersigned counsel, four short articles to DOPSR, which will be discussed separately in paragraphs 74-86 below. The undersigned stated, "I am aware that Paul

Jacobsmeyer has claimed that any submission not received directly from the author will be summarily denied. However, this policy—should it exist—is a violation of law, and if DOPSR chooses to deny clearance for these submissions based on the fact that my client has elected to have his lawyer handle the logistics of prepublication review for his fully unclassified manuscripts, please be aware that we will pursue all legal avenues at our disposal. Should you desire to meet with my client to discuss any concerns, I will be happy to facilitate such a discussion, but all correspondence regarding these submissions must be directed to me."

65. The undersigned further stated, "I similarly expect that DOPSR will reverse its denial of my client's 6 October 2021 submission, *Crowded Skies*, . . . and process it for release expeditiously, in light of the fact that your denial of that submission was exclusively based on the fact that I submitted the unclassified manuscript to DOPSR. Should you fail to do so, we will file a complaint in the appropriate federal district court."

66. The same day, DOPSR official Tim West ("West") replied to the undersigned, asking, "Do you have the cover letters for these submissions? We just need one to make a complete record. Please include contact info, a date you would the review complete, and a statement that says to the best of your knowledge, it does not contain classified info."

67. The undersigned replied, "Is there a particular form you would like me to use?" West replied, "No form is required. Forms are only for other DoD agencies. Usually, you would use your office letterhead when submitted on anothers [sic] behalf. Any format is ok, we just need it for our records."

68. On 14 January 2022, the undersigned submitted a cover letter regarding *Crowded Skies* to DOPSR, which summarized the dispute with Jacobsmeyer and concluded, "Today I sent a new email to DOPSR explaining in part that this agency action was unreasonable and advising that we would seek judicial review of DOPSR's denial if DOPSR did not expeditiously conduct a prepublication review of *Crowded Skies*. I received a response from DOPSR stating that I needed to submit a cover letter containing certain information to complete your file. Thank you for resolving this matter, and please accept this letter for your records."

69. To satisfy the criteria specified by West, the undersigned stated, "My contact information is in the letterhead at the top of this message. My client and I are available to discuss this document at your convenience. Because of the delay caused by Mr. Jacobsmeyer's denial and the fact that this book is currently scheduled to be published—not submitted to the publisher—in April 2022 after Dr. Hopkins pushed back the publisher's submission deadline several times to accommodate DOPSR's review, we request that you expedite your review of this

manuscript and provide final clearance to publish as soon as possible. To the extent a specific date is required, please consider this a request for a response no later than 31 January 2022. Dr. Hopkins conducted his research for this book entirely from public sources—most of which are cited in the manuscript itself. To the best of my knowledge—and Dr. Hopkins's knowledge as well—this manuscript contains no classified information."

70. On 28 February 2022, Sturgis sent the undersigned the Sturgis Email mentioned above: "We note that you have submitted several prepublication review requests on behalf of your client, Dr. Hopkins, most recently on January 14, 2022. An Action Officer emailed you last fall regarding Dr. Hopkins' second book submission informing you that DOPSR needed the author's contact info, and that DOPSR could not start the review without his information. As you did not respond to multiple requests, DOPSR closed Dr. Hopkins' book submission on November 24, 2021."

71. Sturgis added, "You have indicated that you are the sole correspondent for Dr. Hopkins' submissions, and that DOPSR is not right to administratively close any of the submissions. This is incorrect. As Dr. Hopkins is the author, held a security clearance, and has the prepublication obligation, he has the institutional responsibility and legal requirement to ensure that there is no non-public DoD information in the submissions. DoD's relationship is with the author,

not his legal representative. Failure of the author to correspond with the DoD evades the intent of the prepublication review process to not disclose non-public DoD information."

72. Sturgis concluded, "Our insistence on this process is standard DoD policy. To underscore the seriousness of this matter, reviewing components have identified instances of non-public information in Dr. Hopkins' first book submission, and based on the subject of the submissions, there is a likelihood that the second book and articles contain non-public DoD information. Providing this material to you is a violation of Dr. Hopkins' non-disclosure agreement. This violation could result in an Unauthorized Disclosure investigation by the Defense Counterintelligence and Security Agency. DoD's continued engagement with you perpetuates and endorses this unauthorized disclosure of DoD information by sanctioning your unauthorized access to the author's submissions. Hence, we are closing all of Dr. Hopkins' requests until he contacts our office."

73. Sturgis did not explain why DOPSR had at that time never mentioned any alleged "instances of non-public information" in *Klaxon!* to Hopkins, did not state if the allegedly "non-public information" is classified or not, did not identify the "standard DoD policy" to which he referred, and did not explain West's statement that "[u]sually, you would use your office letterhead when submitted on

anothers [sic] behalf," which necessarily indicates the existence of a standard operating procedure for handling third-party submissions.

### *2. "Bring Back the Looking Glass?"*

74. On 14 January 2022, Hopkins submitted, through undersigned counsel, a four-page article entitled "Bring Back the Looking Glass? Do We Need 24/7 Airborne Command Posts?" ("'Bring Back the Looking Glass?'") to DOPSR for prepublication review, even though it was, like his other manuscripts, exclusively sourced from publicly released and declassified records.

75. To satisfy the criteria specified by West, the undersigned stated in the cover letter, "My contact information is in the letterhead at the top of this message. My client and I are available to discuss this document at your convenience. Please complete your review of this document by 15 March 2022. To the best of my knowledge—and Dr. Hopkins's knowledge as well—this document is sourced exclusively from publicly available information and contains no classified information."

76. DOPSR stopped processing "Bring Back the Looking Glass?" pursuant to the Sturgis Email.

### *3. "Effectiveness of the Alert Force"*

77. On 14 January 2022, Hopkins submitted, through undersigned counsel, an eight-page article entitled "Effectiveness of the Alert Force" to DOPSR

for prepublication review, even though it was, like his other manuscripts, exclusively sourced from publicly released and declassified records.

78. To satisfy the criteria specified by West, the undersigned stated in the cover letter, "My contact information is in the letterhead at the top of this message. My client and I are available to discuss this document at your convenience. Please complete your review of this document by 15 March 2022. To the best of my knowledge—and Dr. Hopkins's knowledge as well—this document is sourced exclusively from publicly available information and contains no classified information."

79. DOPSR stopped processing "Effectiveness of the Alert Force" pursuant to the Sturgis Email.

***4. "Why 15 Minutes Is Irrelevant"***

80. On 14 January 2022, Hopkins submitted, through undersigned counsel, a six-page article entitled "Why 15 Minutes Is Irrelevant" to DOPSR for prepublication review, even though it was, like his other manuscripts, exclusively sourced from publicly released and declassified records.

81. To satisfy the criteria specified by West, the undersigned stated in the cover letter, "My contact information is in the letterhead at the top of this message. My client and I are available to discuss this document at your convenience. Please complete your review of this document by 15 March 2022. To the best of my

knowledge—and Dr. Hopkins's knowledge as well—this document is sourced exclusively from publicly available information and contains no classified information."

82. DOPSR stopped processing "Why 15 Minutes Is Irrelevant" pursuant to the Sturgis Email.

***5. "DoD Prepublication Review"***

83. On 14 January 2022, Hopkins submitted, through undersigned counsel, a five-page article entitled "DoD Prepublication Review: A Broken, Arbitrary System Predisposed to Rejection" ("'DoD Prepublication Review'") to DOPSR for prepublication review, even though it was exclusively sourced from publicly released information.

84. Notably, "DoD Prepublication Review" dealt with significantly different subject matter than *Klaxon!*. In fact, it simply described Hopkins's efforts to obtain clearance for his manuscripts and compared his case to another recent case of a former Air Force member publishing information without prepublication clearance with apparently no consequences.

85. To satisfy the criteria specified by West, the undersigned stated in the cover letter, "My contact information is in the letterhead at the top of this message. My client and I are available to discuss this document at your convenience. Please complete your review of this document by 15 March 2022. To the best of my

knowledge—and Dr. Hopkins's knowledge as well—this document is sourced exclusively from publicly available information and contains no classified information."

86. DOPSR stopped processing "DoD Prepublication Review" pursuant to the Sturgis Email.

## ***PART III: LITIGATION DEVELOPMENTS***

87. On 27 March 2022, Hopkins filed the Complaint in this case.

88. On 7 June 2022, DOD filed the Answer in this case.

89. On 20 July 2022, DOPSR agreed to begin prepublication review of all of Hopkins's manuscripts.

90. Between September 2022 and October 2023, DOPSR issued determinations regarding all of Hopkins's manuscripts, as described below.

### ***1. Klaxon!***

91. On 30 September 2022, DOPSR completed its processing of the body text of the manuscript and redacted a significant amount of information.

92. On 31 January 2023, Hopkins, through undersigned counsel, submitted photos and captions to DOD's counsel to be forwarded to DOPSR, without objection.

93. On 21 July 2023, Hopkins submitted a draft response intended to assist his undersigned counsel in prosecuting this case ("Draft Response") directly

to DOPSR for prepublication review, which included a rebuttal of the *Klaxon!* redactions.

94. On 9 August 2023, DOPSR completed its processing of the photos and captions and redacted a significant amount of information.

95. On 29 September 2023, DOPSR lifted the redaction of thirteen words.

96. On 19 October 2023, DOPSR lifted the redaction of two sentences.

***2. "Searching for Mobile ICBMs"***

97. On 3 May 2023, DOPSR completed its processing and redacted a significant amount of information.

98. On 19 October 2023, DOPSR lifted the redaction of three words.

***3. "Crowded Skies"***

99. On 21 February 2023, Hopkins, through undersigned counsel, submitted photos and captions to DOD's counsel to be forwarded to DOPSR, without objection.

100. On 29 March 2023, DOPSR completed its processing of the body text of the manuscript and redacted a significant amount of information.

101. On 26 April 2023, Hopkins, through undersigned counsel, submitted a rebuttal regarding two pages to DOPSR while accepting the other redactions, without objection. This rebuttal specifically identified the article from which all the

redacted information was taken and all of the declassified and unclassified documents cited in that article.

102. On 14 June 2023, DOPSR responded to Hopkins's rebuttal and refused to lift any redactions from the two pages in question, while it cleared the photos and captions for public release in their entirety.

103. On 21 July 2023, Hopkins submitted the Draft Response to DOPSR for prepublication review, which included a further rebuttal of the Crowded Skies redactions.

104. On 7 August 2023, DOPSR rescinded its previous approval of *Crowded Skies* and began processing it a third time.

105. On 26 September 2023, DOPSR completed its reprocessing and redacted additional information.

***4. "Bring Back the Looking Glass?"***

106. On 27 March 2023, DOPSR completed its processing and redacted a significant amount of information.

107. On 19 October 2023, DOPSR lifted the redaction of two words.

***5. "Effectiveness of the Alert Force"***

108. On 27 March 2023, DOPSR completed its processing and redacted two lines.

109. On 19 October 2023, DOPSR lifted the redactions and cleared the manuscript for public release.

### *6. "Why 15 Minutes Is Irrelevant"*

110. On 27 March 2023, DOPSR completed its processing and redacted a significant amount of information.

111. On 19 October 2023, DOPSR lifted the redaction of a moderate amount of information.

### *7. "DoD Prepublication Review"*

112. On 27 March 2023, DOPSR completed its processing and cleared the manuscript for public release.

113. The history of the Draft Response referred to in paragraphs 93 and 103 above is also relevant to this case.

114. Hopkins's Draft Response was a mostly comprehensive response addressing almost all of DOD's redactions from the various manuscripts included in this case.

115. The Draft Response followed a simple pattern. First Hopkins would indicate the piece of information DOPSR had redacted from a manuscript. Then he would attach an image of the relevant portion of the unclassified and/or officially released document from which he sourced the information. Then he would give a full citation to the source document.

116. For example, if Hopkins had written the sentence "The case was first assigned to Judge Cummings before it was reassigned twice: once to Judge Fitzwater and finally to Judge Brown" on page 25 of one of his manuscripts, and DOPSR had redacted the names of the judges assigned to the case, the relevant section of the Draft Response would have looked like this:

**P. 25 Judges' Names**

> This case was originally before United States District Court Senior Judge Sam R. Cummings. On June 2, 2023, this case was reassigned to United States District Court Senior Judge Sidney A Fitzwater pursuant to Special Order 3-348. (Doc. 19). On June 6, 2023, this case then reassigned to United States District Court Judge Ada E. Brown pursuant to Special Order 3-249. (Doc. 21).

6/13/23 Order, Hopkins v. DOD, No. 3:22-CV-00706-E (N.D. Tex.)

117. Virtually everything in the Draft Response was either a summary of redacted material from a manuscript or a pasted image from an unclassified publicly available source and a citation to that source.

118. This means that if one were to redact all the manuscript summaries from the Draft Response, the only substantive information that would be left would be images of unclassified, publicly available documents and the corresponding citations.

119. On 23 October 2023, DOPSR informed Hopkins that he was prohibited from providing anything in the Draft Response to the undersigned.

## CAUSES OF ACTION

## *PART I: SAF/PA VIOLATIONS*

## FIRST CAUSE OF ACTION

## (1A/APA/DJA – *KLAXON!* – REFERRAL TO DOPSR AND IMPROPER CENSORSHIP)

120. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

121. Hopkins properly submitted, pursuant to one or more NDAs, the *Klaxon!* manuscript to SAF/PA for prepublication review.

122. AFI 35-102 states that "Air Force PA offices will clear, without delay, the maximum amount of information at the lowest competent and review level."

123. As Hopkins advised SAF/PA, *Klaxon!* included almost the same content as *SAC in the UK*, which had not been referred to DOPSR. Because of that, combined with the facts that the sources of the information were clearly indicated in the manuscript itself, that *Klaxon!* met none of the 3-1 Criteria, and that Hopkins's submission had gone unanswered for over six months through no fault of his own, SAF/PA's referral of *Klaxon!* to DOPSR was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. This referral also constitutes a final agency action.

124. As a direct result of SAF/PA's improper referral of *Klaxon!* to DOPSR, DOPSR terminated the review process because of an unrelated dispute over communication protocols, even though SAF/PA had been comfortable communicating with Hopkins's undersigned counsel.

125. Furthermore, AFMAN 35-101 states that SAF/PA must "[u]se all reasonable measures to expedite staffing at all levels to make sure publication deadlines, speaking dates, and other valid deadlines are met." In contrast, according to Jacobsmeyer, "DOPSR does not work with, or accommodate, publishers' timelines." As a direct result of SAF/PA's improper referral of *Klaxon!* to DOPSR, Hopkins was deprived of a rapid decision which would not jeopardize his publication agreement, thereby causing him adverse and harmful professional and financial effects.

126. Additionally, because SAF/PA's improper referral of *Klaxon!* to DOPSR led to DOPSR's closure of Hopkins's request, it constitutes an impermissible infringement of his First Amendment right to publish unclassified information.

127. Lastly, because DOPSR ended up censoring unclassified information, this constitutes an impermissible infringement of Hopkins's First Amendment right to publish unclassified information.

128. Hopkins is therefore entitled to relief in the form of: a declaratory judgment that SAF/PA violated Air Force and DOD regulations and the First Amendment by referring *Klaxon!* to DOPSR; and (b) an injunction compelling DOPSR to immediately clear all unclassified information for release.

**SECOND CAUSE OF ACTION**

**(1A/APA/DJA – "SEARCHING FOR MOBILE ICBMS" – REFERRAL TO DOPSR AND IMPROPER CENSORSHIP)**

129. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

130. Hopkins properly submitted, pursuant to one or more NDAs, the "Searching for Mobile ICBMs" manuscript to SAF/PA for prepublication review.

131. Because of the fact that "Searching for Mobile ICBMs" did not require coordination with other DOD components and met none of the 3-1 Criteria, SAF/PA's referral of the article to DOPSR was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. This referral also constitutes a final agency action.

132. Upon information and belief, as a direct result of SAF/PA's improper referral of this article to DOPSR, DOPSR terminated the review process because of an unrelated dispute over communication protocols, even though SAF/PA had been comfortable communicating with Hopkins's undersigned counsel.

133. Hopkins was also deprived of a rapid decision, thereby causing him adverse and harmful professional and financial effects.

134. Additionally, because, upon information and belief, SAF/PA's improper referral of this article to DOPSR led to DOPSR's closure of Hopkins's request, it constitutes an impermissible infringement of his First Amendment right to publish unclassified information.

135. Upon information and belief, SAF/PA referred this article to DOPSR as retaliation for Hopkins's complaints about the process and his attempts to protect his First Amendment rights.

136. Lastly, because DOPSR ended up censoring unclassified information, this constitutes an impermissible infringement of Hopkins's First Amendment right to publish unclassified information.

137. Hopkins is therefore entitled to relief in the form of: (a) a declaratory judgment that SAF/PA violated Air Force and DOD regulations and the First Amendment by referring "Searching for Mobile ICBMs" to DOPSR; and (b) an injunction compelling DOPSR to immediately clear all unclassified information for release.

## THIRD CAUSE OF ACTION

## (1A/APA/DJA – REFUSAL TO ACCEPT SUBMISSIONS)

138. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

139. Despite the fact that Hopkins, as a former Air Force officer, is entitled to submit his manuscripts to SAF/PA for prepublication review pursuant to Air Force and DOD regulations, SAF/PA has directed him to submit all future manuscripts, regardless of subject matter, to DOPSR directly.

140. This categorical order requires Hopkins to submit manuscripts directly to DOPSR even if they do not require coordination with other DOD components and do not meet any of the 3-1 Criteria.

141. Upon information and belief, SAF/PA issued this order as retaliation for Hopkins's complaints about the process and his attempts to protect his First Amendment rights.

142. This categorical order was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. It also constitutes a final agency action.

143. As a result of this order, Hopkins will be deprived of numerous benefits to which he is entitled, including, but not limited, a prompt review process which respects publishers' deadlines.

144. Additionally, because DOPSR—unlike SAF/PA—will not allow Hopkins's counsel to represent him in the prepublication review process, this categorical order constitutes an impermissible infringement of his First Amendment rights to provide unclassified information to his counsel and receive informed legal assistance.

145. Hopkins has submitted additional manuscripts directly to DOPSR since this litigation commenced which should have properly been reviewed by SAF/PA, and he has specific plans to continue to do so as a professional military historian and author.

146. Hopkins is therefore entitled to relief in the form of: (a) a declaratory judgment that SAF/PA violated Air Force and DOD regulations and the First Amendment by directing him to submit all future manuscripts to DOPSR; and (b) an injunction compelling SAF/PA to process Hopkins's future submissions according to Air Force and DOD regulations and only refer manuscripts to DOPSR which require coordination with other DOD components or meet one of the 3-1 Criteria.

## ***PART II: DOPSR VIOLATIONS***

## **FOURTH CAUSE OF ACTION**

## **(1A/APA/DJA – *KLAXON!* – ADMINISTRATIVE CLOSURE AND IMPROPER CENSORSHIP)**

147. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

148. Hopkins properly submitted, pursuant to one or more NDAs, the *Klaxon!* manuscript to SAF/PA for prepublication review.

149. To the best of Hopkins's knowledge and understanding, *Klaxon!* does not contain any classified information.

150. DOPSR is legally prohibited from precluding Hopkins from publishing unclassified information.

151. DOPSR has failed to show that Hopkins's First Amendment right to publish is outweighed by the Government's interest in efficiently carrying out its mission by minimizing harms that are real, not merely conjecture.

152. DOPSR has failed to demonstrate the existence of substantial government interests that would enable it to prohibit the publication of unclassified information within *Klaxon!* based solely on the fact that Hopkins's counsel submitted the manuscript for review.

153. DOPSR's restrictions imposed upon Hopkins have not been narrowly confined to avoid infringement of his First Amendment rights. It has unnecessarily restricted unclassified speech that does not serve to protect any substantial government interest.

154. Because DOPSR has impermissibly infringed upon Hopkins's right to publish unclassified information in *Klaxon!*, it has violated his First Amendment rights.

155. Additionally, because DOPSR will not allow Hopkins's counsel to represent him in the prepublication review process, it has violated his First Amendment rights to provide unclassified information to his counsel and receive informed legal assistance.

156. Upon information and belief, DOPSR administratively closed the processing of *Klaxon!* as retaliation for Hopkins's attempts to protect his First Amendment rights.

157. Hopkins has suffered or may suffer actual adverse and harmful effects, including, but not limited to, possible civil penalties for breaching his publication contract and/or lost or jeopardized present or future financial and publishing opportunities.

158. Lastly, because DOPSR ended up censoring unclassified information, this constitutes an impermissible infringement of Hopkins's First Amendment right to publish unclassified information.

159. Hopkins is therefore entitled to relief in the form of: (a) a declaratory judgment that DOPSR violated DOD regulations and the First Amendment by administratively closing its review of *Klaxon!*; (b) an injunction compelling all relevant DOD components to interface with Hopkins's undersigned counsel regarding *Klaxon!* unless specifically identified classified information is involved; and (c) an injunction compelling DOPSR to immediately clear all unclassified information for release.

## FIFTH CAUSE OF ACTION

## (1A/APA/DJA – "SEARCHING FOR MOBILE ICBMS" – ADMINISTRATIVE CLOSURE AND IMPROPER CENSORSHIP)

160. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

161. Hopkins properly submitted, pursuant to one or more NDAs, "Searching for Mobile ICBMs" to SAF/PA for prepublication review.

162. To the best of Hopkins's knowledge and understanding, this article does not contain any classified information.

163. DOPSR is legally prohibited from precluding Hopkins from publishing unclassified information.

164. DOPSR has failed to show that Hopkins's First Amendment right to publish is outweighed by the Government's interest in efficiently carrying out its mission by minimizing harms that are real, not merely conjecture.

165. DOPSR has failed to demonstrate the existence of substantial government interests that would enable it to prohibit the publication of unclassified information within this article based solely on the fact that Hopkins's counsel submitted the article for review.

166. DOPSR's restrictions imposed upon Hopkins have not been narrowly confined to avoid infringement of his First Amendment rights. It has unnecessarily restricted unclassified speech that does not serve to protect any substantial government interest.

167. Because DOPSR has impermissibly infringed upon Hopkins's right to publish unclassified information in this article, it has violated his First Amendment rights.

168. Additionally, because DOPSR will not allow Hopkins's counsel to represent him in the prepublication review process, it has violated his First Amendment rights to provide unclassified information to his counsel and receive informed legal assistance.

169. Upon information and belief, DOPSR administratively closed the processing of this article as retaliation for Hopkins's attempts to protect his First Amendment rights.

170. Hopkins has suffered or may suffer actual adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial and publishing opportunities.

171. Lastly, because DOPSR ended up censoring unclassified information, this constitutes an impermissible infringement of Hopkins's First Amendment right to publish unclassified information.

172. Hopkins is therefore entitled to relief in the form of: (a) a declaratory judgment that DOPSR violated DOD regulations and the First Amendment by administratively closing its review of this article; (b) an injunction compelling all relevant DOD components to interface with Hopkins's undersigned counsel regarding this article unless specifically identified classified information is involved; and (c) an injunction compelling DOPSR to immediately clear all unclassified information for release.

## SIXTH CAUSE OF ACTION

## (1A/APA/DJA – *CROWDED SKIES* – ADMINISTRATIVE CLOSURE AND IMPROPER CENSORSHIP)

173. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

174. Hopkins properly submitted, pursuant to one or more NDAs, *Crowded Skies* to DOPSR for prepublication review.

175. To the best of Hopkins's knowledge and understanding, *Crowded Skies* does not contain any classified information.

176. DOPSR is legally prohibited from precluding Hopkins from publishing unclassified information.

177. DOPSR has failed to show that Hopkins's First Amendment right to publish is outweighed by the Government's interest in efficiently carrying out its mission by minimizing harms that are real, not merely conjecture.

178. DOPSR has failed to demonstrate the existence of substantial government interests that would enable it to prohibit the publication of unclassified information within *Crowded Skies* based solely on the fact that Hopkins's counsel submitted the manuscript for review.

179. DOPSR's restrictions imposed upon Hopkins have not been narrowly confined to avoid infringement of his First Amendment rights. It has unnecessarily restricted unclassified speech that does not serve to protect any substantial government interest.

180. Because DOPSR has impermissibly infringed upon Hopkins's right to publish unclassified information in *Crowded Skies*, it has violated his First Amendment rights.

181. Additionally, because DOPSR will not allow Hopkins's counsel to represent him in the prepublication review process, it has violated his First Amendment rights to provide unclassified information to his counsel and receive informed legal assistance.

182. Upon information and belief, DOPSR administratively closed the processing of *Crowded Skies* as retaliation for Hopkins's attempts to protect his First Amendment rights.

183. Hopkins has suffered or may suffer actual adverse and harmful effects, including, but not limited to, possible civil penalties for breaching his publication contract and/or lost or jeopardized present or future financial and publishing opportunities.

184. Lastly, because DOPSR ended up censoring unclassified information, this constitutes an impermissible infringement of Hopkins's First Amendment right to publish unclassified information.

185. Hopkins is therefore entitled to relief in the form of: (a) a declaratory judgment that DOPSR violated DOD regulations and the First Amendment by administratively closing its review of *Crowded Skies*; (b) an injunction compelling

all relevant DOD components to interface with Hopkins's undersigned counsel regarding *Crowded Skies* unless specifically identified classified information is involved; and (c) an injunction compelling DOPSR to immediately clear all unclassified information for release.

## SEVENTH CAUSE OF ACTION

## (1A/APA/DJA – "BRING BACK THE LOOKING GLASS?" – ADMINISTRATIVE CLOSURE AND IMPROPER CENSORSHIP)

186. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

187. Hopkins properly submitted, pursuant to one or more NDAs, "Bring Back the Looking Glass?" to DOPSR for prepublication review.

188. To the best of Hopkins's knowledge and understanding, this article does not contain any classified information.

189. DOPSR is legally prohibited from precluding Hopkins from publishing unclassified information.

190. DOPSR has failed to show that Hopkins's First Amendment right to publish is outweighed by the Government's interest in efficiently carrying out its mission by minimizing harms that are real, not merely conjecture.

191. DOPSR has failed to demonstrate the existence of substantial government interests that would enable it to prohibit the publication of unclassified

information within this article based solely on the fact that Hopkins's counsel submitted the article for review.

192. DOPSR's restrictions imposed upon Hopkins have not been narrowly confined to avoid infringement of his First Amendment rights. It has unnecessarily restricted unclassified speech that does not serve to protect any substantial government interest.

193. Because DOPSR has impermissibly infringed upon Hopkins's right to publish unclassified information in this article, it has violated his First Amendment rights.

194. Additionally, because DOPSR will not allow Hopkins's counsel to represent him in the prepublication review process, it has violated his First Amendment rights to provide unclassified information to his counsel and receive informed legal assistance.

195. Upon information and belief, DOPSR administratively closed the processing of this article as retaliation for Hopkins's attempts to protect his First Amendment rights.

196. Hopkins has suffered or may suffer actual adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial and publishing opportunities.

197. Lastly, because DOPSR ended up censoring unclassified information, this constitutes an impermissible infringement of Hopkins's First Amendment right to publish unclassified information.

198. Hopkins is therefore entitled to relief in the form of: (a) a declaratory judgment that DOPSR violated DOD regulations and the First Amendment by administratively closing its review of this article; (b) an injunction compelling all relevant DOD components to interface with Hopkins's undersigned counsel regarding this article unless specifically identified classified information is involved; and (c) an injunction compelling DOPSR to immediately clear all unclassified information for release.

## EIGHTH CAUSE OF ACTION

## (1A/APA/DJA – "EFFECTIVENESS OF THE ALERT FORCE" – ADMINISTRATIVE CLOSURE)

199. This count is withdrawn.

## NINTH CAUSE OF ACTION

## (1A/APA/DJA – "WHY 15 MINUTES IS IRRELEVANT" – ADMINISTRATIVE CLOSURE AND IMPROPER CENSORSHIP)

200. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

201. Hopkins properly submitted, pursuant to one or more NDAs, "Why 15 Minutes Is Irrelevant" to DOPSR for prepublication review.

202. To the best of Hopkins's knowledge and understanding, this article does not contain any classified information.

203. DOPSR is legally prohibited from precluding Hopkins from publishing unclassified information.

204. DOPSR has failed to show that Hopkins's First Amendment right to publish is outweighed by the Government's interest in efficiently carrying out its mission by minimizing harms that are real, not merely conjecture.

205. DOPSR has failed to demonstrate the existence of substantial government interests that would enable it to prohibit the publication of unclassified information within this article based solely on the fact that Hopkins's counsel submitted the article for review.

206. DOPSR's restrictions imposed upon Hopkins have not been narrowly confined to avoid infringement of his First Amendment rights. It has unnecessarily restricted unclassified speech that does not serve to protect any substantial government interest.

207. Because DOPSR has impermissibly infringed upon Hopkins's right to publish unclassified information in this article, it has violated his First Amendment rights.

208. Additionally, because DOPSR will not allow Hopkins's counsel to represent him in the prepublication review process, it has violated his First Amendment rights to provide unclassified information to his counsel and receive informed legal assistance.

209. Upon information and belief, DOPSR administratively closed the processing of this article as retaliation for Hopkins's attempts to protect his First Amendment rights.

210. Hopkins has suffered or may suffer actual adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial and publishing opportunities.

211. Lastly, because DOPSR ended up censoring unclassified information, this constitutes an impermissible infringement of Hopkins's First Amendment right to publish unclassified information.

212. Hopkins is therefore entitled to relief in the form of: (a) a declaratory judgment that DOPSR violated DOD regulations and the First Amendment by administratively closing its review of this article; (b) an injunction compelling all relevant DOD components to interface with Hopkins's undersigned counsel regarding this article unless specifically identified classified information is involved; and (c) an injunction compelling DOPSR to immediately clear all unclassified information for release.

## TENTH CAUSE OF ACTION

## (1A/APA/DJA – "DOD PREPUBLICATION REVIEW" – ADMINISTRATIVE CLOSURE)

213. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

214. Hopkins properly submitted, pursuant to one or more NDAs, "DoD Prepublication Review" to DOPSR for prepublication review.

215. This article does not contain any classified information.

216. DOPSR is legally prohibited from precluding Hopkins from publishing unclassified information.

217. DOPSR has failed to show that Hopkins's First Amendment right to publish is outweighed by the Government's interest in efficiently carrying out its mission by minimizing harms that are real, not merely conjecture.

218. DOPSR has failed to demonstrate the existence of substantial government interests that would enable it to prohibit the publication of unclassified information within this article based solely on the fact that Hopkins's counsel submitted the article for review.

219. DOPSR's restrictions imposed upon Hopkins have not been narrowly confined to avoid infringement of his First Amendment rights. It has unnecessarily

restricted unclassified speech that does not serve to protect any substantial government interest.

220. Because DOPSR has impermissibly infringed upon Hopkins's right to publish unclassified information in this article, it has violated his First Amendment rights.

221. Additionally, because DOPSR will not allow Hopkins's counsel to represent him in the prepublication review process, it has violated his First Amendment rights to provide unclassified information to his counsel and receive informed legal assistance.

222. Upon information and belief, DOPSR administratively closed the processing of this article as retaliation for Hopkins's attempts to protect his First Amendment rights.

223. Hopkins has suffered or may suffer actual adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial and publishing opportunities.

224. Hopkins is therefore entitled to relief in the form of a declaratory judgment that DOPSR violated DOD regulations and the First Amendment by administratively closing its review of this article.

## ELEVENTH CAUSE OF ACTION

## (1A/APA/DJA – REFUSAL TO ACCEPT COUNSEL'S SUBMISSIONS)

225. Hopkins repeats and realleges the allegations contained in all paragraphs set forth above.

226. Sturgis alleges that DOD has an official policy of administratively closing any requests for prepublication review submitted by an attorney on behalf of an author.

227. Should such a policy exist, it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. It also constitutes a final agency action.

228. DOPSR is legally prohibited from precluding Hopkins from providing unclassified information to his counsel.

229. DOPSR has failed to show that Hopkins's First Amendment right to provide unclassified information to his counsel is outweighed by the Government's interest in efficiently carrying out its mission by minimizing harms that are real, not merely conjecture.

230. DOPSR has failed to demonstrate the existence of substantial government interests that would enable it to prohibit the publication of unclassified information within any document based solely on the fact that Hopkins's counsel submitted the document for review.

231. DOPSR's restrictions imposed upon Hopkins have not been narrowly confined to avoid infringement of his First Amendment rights. It has unnecessarily restricted unclassified speech that does not serve to protect any substantial government interest.

232. Should an author improperly provide classified information to an attorney, the Government possesses several remedies which are more constitutionally appropriate than categorical prior restraint, including, as Sturgis mentioned, "an Unauthorized Disclosure investigation by the Defense Counterintelligence and Security Agency."

233. Should such a policy exist, it constitutes an impermissible infringement of Hopkins's First Amendment rights to provide unclassified information to his counsel and receive informed legal assistance.

234. As a well-respected author of military history books and articles with a continuing duty to submit materials for prepublication review, Hopkins will continue to be harmed by this policy in the future.

235. Hopkins has submitted additional manuscripts directly to DOPSR since this litigation commenced which he should have been able to submit through counsel, and he has specific plans to continue to do so.

236. Hopkins is therefore entitled to relief in the form of: (a) a declaratory judgment that DOPSR's alleged policy violates DOD regulations and the First

Amendment; and (b) an injunction prohibiting any DOD component from administratively closing a request for prepublication review solely due to the fact that a document was submitted by an attorney on behalf of an author client.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Robert Hopkins, III, prays that this Court:

(1) Permanently enjoin the Department of Defense from restraining the publication of any portion of unclassified text within the five documents (not counting "DoD Prepublication Review") discussed herein;

(2) Declare and find that these five documents are unclassified in their entirety;

(3) Order DOD to process Hopkins's undersigned counsel for access, subject to the execution of appropriate NDAs if necessary, to any alleged classified information for purposes of litigating this action;

(4) Declare and find that DOD violated the APA and its internal regulations governing prepublication review;

(5) Order preliminary and permanent injunctive and/or declaratory relief as may be appropriate;

(6) Order DOD to pay Hopkins compensatory damages of up to $300,000 per count;

(7) Award reasonable costs and attorneys' fees as provided in 28 U.S.C. § 2412(d) or any other applicable law;

(8) Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

(9) Grant such other relief as the Court may deem just and proper.

Date: April 12, 2025

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
N.D. Tex. Bar #984704DC
National Security Counselors
1451 Rockville Pike
Rockville, MD 20852
501-301-4672
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*