**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

**Fort Worth Division**

| | | |
|---|---|---|
| ROBERT HOPKINS, III, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 3:22-cv-00706 (O) |
| | * | |
| DEPARTMENT OF DEFENSE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * *

# PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION TO AUTHORIZE HIS COUNSEL TO ACCESS HIS INTENDED EVIDENCE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

FACTUAL AND PROCEDURAL BACKGROUND .......... 1

Hopkins's Manuscripts .......... 2

*Klaxon!* .......... 2

*Crowded Skies* .......... 3

The Draft Responses .......... 3

The Undersigned's Ability to Review Classified Information .......... 4

ARGUMENT .......... 5

I. THE PRESUMPTION OF ACCESS APPLIES .......... 6

II. THE DRAFT RESPONSES ARE NOT PROTECTABLE .......... 8

III. DOD'S ANTICIPATED ARGUMENTS ARE WITHOUT MERIT .......... 11

CONCLUSION .......... 20

CERTIFICATE OF COMPLIANCE .......... 21

**TABLE OF AUTHORITIES**

**Cases:** **Pages**

*Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362 (4th Cir. 1975) ........ 15

*Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410 (5th Cir. 2021) ........ 8

*Brown & Williamson Tobacco v. FTC*, 710 F.2d 1165 (6th Cir. 1983) ........ 7

*Cepeda v. City of Rockwall*, No. 23-2234, 2024 WL 264688 (N.D. Tex. Jan. 24, 2024) ........ 18

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) ........ 12

*Frederick Douglass Found., Inc. v. Dist. of Cola.*, 82 F.4th 1122 (D.C. Cir. 2023) ........ 5

*IFG Port Holdings, LLC v. Lake Charles Harbor & Terminal Dist.*, 82 F.4th 402 (5th Cir. 2023) ........ 8

*Jeon v. Holder*, 354 F. App'x 50 (5th Cir. 2009) ........ 18

*June Med. Servs., LLC v. Phillips*, 22 F.4th 512 (5th Cir. 2022) ........ 8

*Kellam v. Metrocare Servs.*, No. 12-352, 2013 WL 12093753 (N.D. Tex. May 31, 2013) ........ 18

*Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014) ........ 19

*Lawless v. DOD*, No. 21-2859, slip op. (D.D.C. Mar. 6, 2023) ........ 17

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) ........ *passim*

*Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978) ........ 7

*Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653 (3d Cir. 1991) ........ 7

*Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980) ........ 7

*Shaffer v. DIA*, 102 F. Supp. 3d 1 (D.D.C. 2015) ........ 11

*Shrum v. City of Coweta*, 449 F.3d 1132 (10th Cir. 2006) ........ 5

*Skyline Corp. v. NLRB*, 613 F.2d 1328 (5th Cir. 1980) ........ 18

*Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003) ........ 11, 15

*United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995) ........ 7

*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) ....................................................10

*Wilcox v. Leapley*, 488 N.W.2d 654 (S.D. 1992)...................................................................18

## INTRODUCTION

Plaintiff Robert Hopkins, III ("Hopkins") commenced this litigation against Defendant Department of Defense ("DOD") in 2022 in part to challenge the unconstitutional censorship of documents that he properly submitted for prepublication review. This Motion concerns DOD's further unlawful censorship during the prosecution of this case, in which the agency has prohibited Hopkins from even providing evidence to his undersigned counsel to be used in opposing DOD's motions for summary judgment. Even assuming *arguendo* that the information DOD redacted from Hopkins's manuscripts is currently and properly classified *in that context*—which the Court should not—there is no basis for DOD to prevent Hopkins from working with his attorney to prove otherwise, since, as demonstrated below, the documents in question consist almost entirely images of portions of other unclassified, declassified, and/or publicly available documents. DOD seeks to hamstring Hopkins's counsel and ensure that the Court only sees the evidence in question in a draft form created without the assistance of counsel, while his counsel is forced to oppose DOD's motion without knowing what evidence he has at his disposal. Accordingly, Hopkins asks this Court to explicitly authorize Hopkins to share the two documents in question ("the Draft Responses") with his undersigned counsel and prohibit DOD from taking any adverse action against him or his counsel in reprisal.

## FACTUAL AND PROCEDURAL BACKGROUND

The general facts of this case relevant to this Motion are set forth in the First Amended Complaint (1st Am. Compl., Dkt. #101 (filed Oct. 15, 2026) [hereinafter FAC]), and will only be summarized herein.

**Hopkins's Manuscripts**

Any person who possesses a security clearance to access classified national security information must sign a Non-Disclosure Agreement ("NDA") agreeing, *inter alia*, to submit any documents related to his/her national security employment for prepublication review before publishing them. Accordingly, Hopkins submitted multiple manuscripts to the United States Air Force Office of Public Affairs ("SAF/PA") or the Defense Office of Prepublication and Security Review ("DOPSR"), as appropriate, between 14 December 2020 and 14 January 2022. (*Id.* ¶¶ 36-86.)

This Motion primarily pertains to two manuscripts: (1) *Klaxon! Strategic Air Command Alert During the Cold War* ("*Klaxon!*"); and (2) *Crowded Skies: Cold War Reconnaissance Over the Baltic* ("*Crowded Skies*"). However, to be clear, Hopkins is not requesting that he be granted access to *those manuscripts*, only to documents Hopkins created to be used as evidence and assistance to his undersigned counsel when opposing DOD's unlawful censorship.

*Klaxon!*

On 14 December 2020, Hopkins submitted *Klaxon!* to SAF/PA. (*Id.* ¶ 36.) On 30 September 2022, after Hopkins filed this case, DOPSR finally completed its review of the body text of *Klaxon!* and censored a significant amount of information. (*Id.* ¶ 91.) On 31 January 2023, Hopkins submitted *Klaxon!* photos and captions to DOPSR. (*Id.* ¶ 92.) On 9 August 2023, DOPSR completed its processing of the photos and captions and censored a significant amount of information. DOPSR then reversed its censorship decision on a small number of items in September and October 2023. (*Id.* ¶¶ 95-96.)

*Crowded Skies*

On 6 October 2021, Hopkins submitted *Crowded Skies* to DOPSR. (*Id.* ¶ 59.) On 21 February 2023, Hopkins submitted *Crowded Skies* photos and captions to DOPSR. (*Id.* ¶ 99.) On 29 March 2023, well after Hopkins filed this case, DOPSR completed its review of the body text of *Crowded Skies* and censored a significant amount of information. (*Id.* ¶ 100.) On 14 June 2023, after Hopkins challenged its redactions on two pages, DOPSR cleared the photos and captions for public release but continued to censor the two pages in question. (*Id.* ¶ 102.) On 7 August 2023, DOPSR rescinded its previous approval, and it issued a new determination on 26 September 2023 after censoring more information. (*Id.* ¶¶ 104-05.)

**The Draft Responses**

On 21 July 2023, Hopkins submitted a lengthy document ("the *Klaxon!* Draft Response") to DOPSR, which constituted "a mostly comprehensive response addressing almost all of DOD's redactions from the various manuscripts included in this case at the time of its authorship." (Hopkins Decl. ¶ 4, attached as Ex. A.)[1] While it technically addressed multiple manuscripts, this document primarily focused on *Klaxon!* redactions. (*Id.*) On 23 October 2023, DOPSR responded to Hopkins advising him that he was prohibited from providing any of the *Klaxon!* Draft Response to his undersigned counsel. (*Id.* ¶ 9.) The *Klaxon!* Draft Response was filed *ex*

[1] The Hopkins Declaration filed with this Motion is unsigned. Hopkins is in rural South America without access to a printer or scanner. The undersigned has been unable to communicate with him today except for one brief message conveying this information. He is confident that the declaration is accurate and will file a signed copy as soon as Hopkins is able to print, sign, and scan it. If he learns that the declaration is inaccurate in any respect, he will advise the Court immediately and, if necessary, file a corrected brief. The undersigned apologizes sincerely to the Court for this complication; he did not learn of Hopkins's unavailability until three hours before the midnight filing deadline, after unsuccessfully attempting to reach him over the course of the day. He was able to converse normally with Hopkins yesterday.

*parte* and *in camera* by DOD on 11 August 2025. (Not. of Lodging of *Ex Parte*, *In Camera* Classified Mem. & App'x, Dkt. #89, at 1 (filed Aug. 11, 2025).)

On 26 October 2026, Hopkins submitted a similarly constructed document ("the *Crowded Skies* Draft Response") to DOPSR. (FAC ¶ 10.) This document exclusively addressed *Crowded Skies* redactions. (*Id.* ¶ 11.) Hopkins included a cover letter, which stated, in pertinent part: "I request to have the rebuttal cleared for limited distribution to my attorney—and only for my attorney—for his use in my current litigation with DoD . . . . Please clear this document for limited distribution to my attorney by 15 November 2026 to comply with . . . Chief District Judge Reed O'Connor's 16 October 2026 order for the parties to expeditiously brief a motion for summary judgement in the case." (*Id.* ¶ 13.) As of this writing, DOPSR has not responded to the *Crowded Skies* Draft Response or authorized Hopkins to provide it to his undersigned counsel. (*Id.* ¶ 14.)

**The Undersigned's Ability to Review Classified Information**

Hopkins's undersigned counsel does not have a current security clearance. However, this does not necessarily mean that he cannot view classified information. The Intelligence Community has a standard process called an LSA (for Limited Security Access or Limited Security Approval), by which a private attorney is allowed to access and review specific classified information—generally classified at the Secret level or lower—necessary to represent a particular client. An LSA is not a full—or even an interim—security clearance, and each LSA is specific to a particular client and a particular case, only allowing the private attorney to review the classified information relevant to that particular matter.

In the LSA process, the private attorney, after a brief investigation, signs the same NDA that any other clearance holder would sign, and he is bound by the same restrictions. The

undersigned has held many LSAs in the past and currently holds at least ten with the Central Intelligence Agency ("CIA"), Office of the Director of National Intelligence, and various DOD components, including the National Security Agency and National Geospatial-Intelligence Agency. He reviews classified documents in secure facilities and uses agency-issued computers to draft classified filings, and he puts any documents *he* creates using this information through the same prepublication review process as everyone else before disseminating them outside the agency.

## ARGUMENT

The First Amendment serves as a brake on governmental power. The First Amendment reads, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. "While the Amendment refers to Congress, its prohibition against infringements on free speech applies equally to executive actions." *Frederick Douglass Found., Inc. v. Dist. of Cola.*, 82 F.4th 1122, 1140 (D.C. Cir. 2023). *See also Shrum v. City of Coweta*, 449 F.3d 1132, 1140 (10th Cir. 2006) (holding "the First Amendment applies to exercises of executive authority no less than it does to the passage of legislation," a principle that the Supreme Court has "assumed on countless occasions").

Hopkins now respectfully asks the Court to authorize his undersigned counsel to access the Draft Responses—or reasonably sanitized versions thereof—on the grounds that they consist virtually entirely of literal images of passages from other publicly available documents which have been either previously officially disclosed or are not otherwise classified. The presumption of access to judicial records outweighs any interest DOD may have in the nondisclosure of this

unclassified information, and in any case, DOD cannot meet its burden of proving that the unclassified, publicly available information in these documents warrants the drastic consequence of being forcibly withheld from Hopkins's own counsel so that he cannot mount an intelligent defense against the Government's forthcoming dispositive motion, supported as it will be by sworn declarations filed *ex parte* and *in camera* asking the Court to trust the conclusions of the declarants over what it can see with its own eyes, because they are employed by the federal Government and warrant deference from this Court.

## I. THE PRESUMPTION OF ACCESS APPLIES

It is undisputed that Hopkins intends to file some version of the Draft Responses when he opposes DOD's dispositive motion, and that he wishes for his undersigned counsel to help him draft a final, polished version, as well as to be able to cite to whatever version he files. Moreover, DOD already filed the *Klaxon!* Draft Response as part of the record, and it will likely promise that it will provide the *Crowded Skies* Draft Response to the Court directly as well, instead of Hopkins being allowed to provide the final document he intends to be used as evidence. While Hopkins contends that he and not DOD should provide his own evidence to the Court in the form he believes appropriate when he files his opposition to DOD's dispositive motion, he does request that the Court order DOD to provide the *Crowded Skies* Draft Response to it *in camera* and *ex parte* for the purposes of adjudicating *this* Motion (as well as reviewing the *Klaxon!* Draft Response already made part of the record on 11 August 2025), so that the Court can confirm for itself the allegations made herein.[2]

[2] To be clear, once the Court has resolved this Motion, it should not rely on the Draft Responses in the context of future disputes, since they are mere drafts written for the purposes of assisting Hopkins's undersigned counsel in his prosecution of this case (Hopkins Decl. ¶ 3) and would under any other circumstances be squarely protected by the attorney-client privilege and never seen by the Court but for DOD's unjustified censorship.

Therefore, even though Hopkins at this point does not seek to have the Draft Responses as they now exist filed on the public record, the fact that a final version of them will be offered as material evidence to oppose summary judgment heavily supports the unsealing of this information. *See*, *e.g.*, *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) (identifying "role of the material at issue in the exercise of Article III judicial power" as a key consideration). This presumption in favor of disclosure can be found in both common law and First Amendment jurisprudence. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."). The Third Circuit summarized the existing case law thusly:

> The public's exercise of its common law access right in civil cases promotes public confidence in the judicial system . . . . As with other branches of government, the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness. Access to civil proceedings and records promotes public respect for the judicial process and helps to assure that judges perform their duties in an honest and informed manner. Accordingly, we have applied the presumption of public access to a variety of civil hearings and records, including the transcript of a civil trial and exhibits admitted at trial; settlement documents filed with the district court as well as post-settlement motions; and a civil hearing for a preliminary injunction and transcripts of that hearing.

*Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 660 (3d Cir. 1991) (quotations and citations omitted). *See also Richmond Newspapers v. Virginia*, 448 U.S. 555, 580 n.17 (1980) ("historically both civil and criminal trials have been presumptively open"); *Brown & Williamson Tobacco v. FTC*, 710 F.2d 1165, 1178 (6th Cir. 1983) ("The Supreme Court's analysis of the justifications for access to the criminal courtroom apply as well to the

civil trial . . . . The concern of Justice Brennan that secrecy eliminates one of the important checks on the integrity of the system applies no differently in a civil setting.”).

By the same token, the Court should not be swayed by the fact that parts of this case allegedly involve classified information, because there is no reason to believe that *the Draft Responses* contain classified information. Accordingly, without any evidence to the contrary, the presumption in favor of disclosure cannot be rebutted, since “[t]he government has no legitimate interest in censoring unclassified materials.” *McGehee v. Casey*, 718 F.2d 1137, 1141 (D.C. Cir. 1983).

The Fifth Circuit explained, “We recently instructed that ‘courts should be ungenerous with their discretion to seal judicial records’ and warned that ‘we heavily disfavor sealing information placed in the judicial record.’” *IFG Port Holdings, LLC v. Lake Charles Harbor & Terminal Dist.*, 82 F.4th 402, 411 (5th Cir. 2023) (citations omitted) (quoting *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 418 (5th Cir. 2021), and *June Med. Servs., LLC v. Phillips*, 22 F.4th 512, 519-20 (5th Cir. 2022)). DOD cannot overcome this presumption with respect to the Draft Responses.

## II. THE DRAFT RESPONSES ARE NOT PROTECTABLE

As Hopkins testifies, he followed a straightforward pattern when writing the Draft Responses so as to make it easy for DOPSR to match the text redacted from his manuscripts with his publicly available, unclassified source for that specific information. He describes this pattern thusly:

> First I would indicate the piece of information DOPSR had redacted from a manuscript. Then I would attach an image of the relevant portion of the unclassified and/or officially released document from which I sourced the information. Then I would give a full citation to the source document.

> For example, if I had written the sentence "The case was first assigned to Judge Cummings before it was reassigned twice: once to Judge Fitzwater and finally to Judge Brown" on page 25 of one of my manuscripts, and DOPSR had redacted the names of the judges assigned to the case, the relevant section of my response document would have looked like this:
>
> **P. 25 Judges' Names**
>
> This case was originally before United States District Court Senior Judge Sam R. Cummings. On June 2, 2023, this case was reassigned to United States District Court Senior Judge Sidney A Fitzwater pursuant to Special Order 3-348. (Doc. 19). On June 6, 2023, this case then reassigned to United States District Court Judge Ada E. Brown pursuant to Special Order 3-249. (Doc. 21).
>
> 6/13/23 Order, Hopkins v. DOD, No. 3:22-CV-00706-E (N.D. Tex.)

(Hopkins Decl. ¶¶ 5-6.)[3]

By writing the Draft Responses in this fashion, he avoided many of the thornier issues which face the Court in its consideration of the manuscripts themselves. First, the description of the redacted text is generally only a few words long, so as to make it generic enough to be unclassified even if the Court ends up crediting DOD's assertion that the actual corresponding manuscript redaction is classified (which, to be clear, it should not). Using Hopkins's example, it is one thing to argue that the specific names "Sam R. Cummings," "Sidney A. Fitzwater," and "Ada E. Brown" as they are placed in the specific paragraph are properly classified pieces of information, but it is something totally different to argue that the phrase "Judges' Names" is a properly classified piece of information.

Second, and most importantly, virtually everything else in the Draft Responses is "a pasted image from an unclassified publicly available source and a citation to that source." (*Id.* ¶

[3] Hopkins also testifies that the *Crowded Skies* Draft Response follows the same pattern. (*Id.* ¶ 12.) Accordingly, any testimony in his declaration discussing the *Klaxon!* Draft Response can also be attributed to the *Crowded Skies* Draft Response.

7.) There is no recontextualizing of the information which might expose classified information, and there is no rephrasing or summarizing of the information which would change its meaning. Each item is the equivalent of an accurate photograph of a document that has been officially determined to be unclassified or at least was located in a public source, along with a citation that allows any readers to confirm that fact for themselves. Accordingly, even assuming *arguendo* that the Court *were* to find that the summaries of redacted information warrant continued protection, it could still not find that the photographs *themselves* do. (*See id.* ¶ 8.) The D.C. Circuit explained this as follows:

> We note, to begin with, that [the author]'s secrecy agreement applies only when he seeks to publish "classified information" that "has come or shall come to [his] attention by virtue of [his] connection with the [Government]." The agreement does not extend to unclassified materials or to information obtained from public sources. The government may not censor such material, "contractually or otherwise." The government has no legitimate interest in censoring unclassified materials. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated.

*McGehee*, 718 F.2d at 1141 (quoting *United States v. Marchetti*, 466 F.2d 1309, 1313 (4th Cir. 1972)).

Of particular relevance to the Court is the fact that *McGehee* identifies two *separate* exceptions to the secrecy agreement. The first pertains to unclassified information and does not need to be discussed further, except to say that DOD must still meet the burden of demonstrating that these images and citations are properly classified. The second exception, however, only requires that the information "has come or shall come to [his] attention by virtue of [his] connection with the [Government]," singling out "information . . . derive[d] from public sources" as not generally warranting protection. *Id.* This second exception critically does not require that the information *be unclassified.* It is virtually impossible to imagine a more crystal clear example

of "information derived from public sources" than an actual image of a public source complete with a citation to that source. Therefore, while Hopkins continues to maintain that all of the information in both his Draft Responses and his manuscripts is unclassified, the Court does not need to reach that question because the information in his Draft Responses is undeniably derived from public sources. *See Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) ("If, on the other hand, the information was not classified properly, then Stillman may publish the manuscript."); *Shaffer v. DIA*, 102 F. Supp. 3d 1, 9 (D.D.C. 2015) ("Nonetheless, when a manuscript contains information that is unclassified, wrongly-classified, or derived from public sources, the Government may not censor such material.").

## III. DOD'S ANTICIPATED ARGUMENTS ARE WITHOUT MERIT

In an attempt to persuade this Court to deny this relief the first time, or even require Hopkins to oppose its first dispositive motion before ruling on this question, DOD made several arguments which do not bear close scrutiny either because they misrepresent the facts or the law or because they simply are not applicable. Hopkins will briefly address them in roughly the order in which they were raised, in reasonable anticipation of them being raised again.

First, as noted above, DOD initially encouraged the Court to wait until after Hopkins had already filed his opposition to its dispositive motion to consider whether the information in the Draft Responses can be withheld from his counsel, but in doing so it demonstrated why the question of whether the *manuscripts* may be censored is separate and distinct from the immediate question of whether the *Draft Responses* may be censored. DOD stated that, when it filed its reply brief to its dispositive motion, "[i]t w[ould] also explain in classified declarations why the sources in Hopkins's alleged public sourcing document do not constitute an official acknowledgement." (Def.'s Comb. Opp'n Pl.'s Mot. Stay Summ. J. Briefing & Mot. Part. Unseal

Class. App'x, Dkt. #39, at 5 (filed Jan. 24, 2024) [hereinafter DOD's Stay Opp'n].)) It later elaborated that it "w[ould] explain to the Court in its classified declarations why sources Hopkins identified do not constitute official disclosures or why the redacted information in the manuscripts has not been declassified." (*Id.* at 9.) However, it did *not* claim that it would explain to the Court in its classified declarations why *the* Klaxon! *Draft Response was not derived from public sources*. Nor could it have, since, as noted above, the Draft Responses are literally comprised of direct images of text that Hopkins obtained from public sources.

This is a critical distinction. As DOD has already argued in the brief filed with its first dispositive motion, the test it cites for "official disclosure" is a highly particular one, in which the author must show that the information being withheld is as specific as the previously released information, that it matches it precisely, and that, most importantly, the information "must already have been made public through an official and documented disclosure." (Def.'s Br. Supp. Mot. Dismiss & Summ. J., Dkt. #32-1, at 47-48 (filed Oct. 4, 2023) [hereinafter DOD's 1st Disp. Mem.] (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990).) DOD stated that it intends to argue that "Dr. Hopkins has failed to identify *official disclosures* of the *specific information* included with his manuscripts, instead asserting that information contained in other sources is generally similar to what he intends to disclose." (*Id.* at 48 (emphasis added).) Put another way, DOD intends to argue that even if the Court accepts that Hopkins's manuscript was entirely derived from public sources, it must still rule in DOD's favor if he cannot show that *those public sources* got the information from "an official and documented disclosure," because it is only applying the "official disclosure" test and not the "derived from public sources" test.

While Hopkins does intend to argue that his manuscripts satisfy the official disclosure test as well, his key argument for the purposes of *this* Motion is that *the Draft Responses* clearly

satisfy the "derived from public sources" test, and that DOD accordingly has no grounds to prevent him from providing it to his counsel. It may be that, after his counsel files his opposition, supported by the final version of the Draft Responses, the Court still finds that Hopkins has not met his burden of demonstrating that the redacted portions of his manuscripts were officially disclosed, but that has no bearing on whether the Draft Responses—i.e. *his evidence*—were themselves exclusively derived from public sources. However, DOD has argued that, left to its own devices, it would only argue that the sources identified in the Draft Responses "do not constitute an official acknowledgement," which is immaterial to question currently before the Court. As explained above, "when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." *McGehee*, 718 F.2d at 1141. Regardless of whether this fact applies to Hopkins's manuscripts, it cannot be denied that it applies to the Draft Responses, and that is all that matters at this juncture.

DOD then pivoted to its main contention that Hopkins is asking the Court to impermissibly "grant[] Hopkins's counsel access to classified information," which it equated to "[t]he granting of a security clearance for access to classified information." (DOD's Stay Opp'n at 6.) However, this is not what Hopkins is asking the Court to do. Hopkins is asking the Court to find that he may share information derived from public sources with his attorney. Hopkins could just as easily be asking the Court to find that he may share a newspaper article discussing a matter the Government considers to be classified with his attorney with the annotation, "this was one of my sources for my book." The fact that DOD claims that the information in the publicly available newspaper article is classified does not change the fact that it is a publicly available newspaper article, and DOD cannot prevent Hopkins from sharing that article with his

undersigned counsel to allow him to prove that the book was improperly redacted. More importantly, a court order authorizing Hopkins to share the newspaper article with his counsel is not the same as granting his counsel a security clearance to view classified information. However, if the Court is still concerned with this comparison, it can always order DOD to give his counsel an LSA—like the numerous LSAs he already has—and require him to follow all the same rules as any other signatory of an Intelligence Community NDA. It does not even have to hold that the information in question is currently and properly classified to do this; it only needs to decide that it *might* be, and let the adversarial process handle the rest.

DOD then renewed an argument it had made previously in this case, stating that its "approach to judicial review has been uniformly applied in prepublication review cases." (*Id.* at 7; *see also* Def.'s Part. Opp'n Pl.'s Mot. Stay, Opposed Cross-Mot. Amend Sched. Order, & Unopposed Req. Expedited Consideration, Dkt. #17, at 5 (filed May 24, 2023) (same).) As Hopkins noted at the time, this is far from an accurate representation of the case law.

In *McGehee*, the plaintiff *and his counsel* were allowed to review both of the CIA's classified *in camera* affidavits and draft and file classified *in camera* affidavits in response. Br. for Appellants at 6-7, *McGehee v. Casey*, No. 81-2233 (D.C. Cir.) (excerpt attached as Ex. B). McGehee's attorney explained the procedure thusly:

> [I]n McGehee the way that worked I had access to the manuscript that was in dispute. I went out to the CIA with my client, I read the affidavits that the CIA filed. My client and I drafted counter-affidavits. A secretary at the CIA typed them up. I delivered them to somebody in the General Counsel's office, and after that, the lawyer got them filed with the court. Our notes and everything were kept out there.

Tr. of 4/26/02 Mot. Hrg. at 105:25-106:8, *Stillman v. DOD*, No. 01-1342 (D.D.C.) (excerpt attached as Ex. C).[4] Furthermore, *McGehee* was not the only such case where a comparable

---

[4] The line preceding this quote contains a scrivener's error when it states, "I wasn't the attorney in McGehee." *Id.* at 105:24. Mr. Lynch was clearly the attorney in that case. *See*, *e.g.*, Ex. B at 1.

process was followed. In *Alfred A. Knopf, Inc. v. Colby*, the author *and his counsel* directly participated in negotiations with the agency, after which the agency reversed its position on 114 out of 339 items. 509 F.2d 1362, 1365 (4th Cir. 1975). It is telling that DOD is attempting to persuade this Court to ignore two of the seminal cases in this field, all for the purpose of preventing Hopkins's counsel from effectively arguing that DOD is misapplying the law and using its unjustified classification decisions to obtain a litigation advantage.

When the D.C. Circuit stated in *Stillman* that a court should "first inspect the manuscript and consider any pleadings and declarations filed by the Government, as well as any materials filed by [the plaintiff]" before determining whether it can "resolve the classification issue without the assistance of plaintiff's counsel," 319 F.3d at 548-49, it meant exactly what it said, which is not what DOD has claimed in this case that it meant. The D.C. Circuit did not state that the Court should only consider "materials filed by the plaintiff *without his attorney*"; it only referred to materials filed by the plaintiff, *period*. This obviously includes any unclassified evidence the plaintiff's attorney files on the plaintiff's behalf, as in any other case. And allowing the plaintiff's counsel to provide unclassified evidence is well within the normal process for "resolv[ing] the classification issue without the assistance of plaintiff's counsel."

This is because "the classification issue" is understood to be the issue of the classification *of the manuscript in question*, which Hopkins is not asking for his counsel to be able to read. DOD, on the other hand, will ask this Court to effectively hold that there is *no* role for the undersigned to play in the decisionmaking process, because it understandably does not want its conclusory declarations to be refuted with countervailing evidence. This is why DOD has relied on *Stillman*'s warning about prematurely "granting [plaintiff's counsel] access to the manuscript and, if similarly necessary, to the Government's classified pleadings and affidavits," *id.* at 549,

without any further analysis of the context. *Stillman* warned about prematurely granting a plaintiff's counsel access to *the manuscript* and *the Government's classified filings*. The D.C. Circuit did *not* warn about prematurely granting a plaintiff's counsel access to *the plaintiff's unclassified evidence*.

On that note, the Court should consider the magnitude of Hopkins's interest in providing the Draft Responses to his undersigned counsel. DOD argues "no harm, no foul" because "the Court will have access to the alleged public sourcing document *in camera*, [so] there is no need for Hopkins's counsel to use that evidence to prove as much to the Court." (DOD's Stay Opp'n at 9 (quotations omitted).) However, this minimizes the harm that being required to meet his burden without the effective assistance of counsel will impose on Hopkins. DOD has already telegraphed that it intends to argue that the exact phrasing and formatting of Hopkins's response means that he has not met the high standard of proving that "*equally specific* information *exactly matching* the information at issue was made public through an official and documented disclosure." (*Id.* at 8.)

In other words, DOD, after reviewing the *Klaxon!* Draft Response internally for three months, explained that its argument was that Hopkins was merely "asserting that information contained in other sources is generally similar to what he intends to disclose." (DOD's 1st Disp. Mem. at 48.) Despite this admission that it intends to hold Hopkins to a highly particular evidentiary standard, DOD nonetheless argues that he will not be harmed if his undersigned counsel is unable to help him meet that standard, because "the Court will have access to" the evidence that DOD maintains does not meet its exacting standards. (DOD's Stay Opp'n at 9.) On the contrary, doing so would rob Hopkins of the ability to make his best arguments and would—at a minimum—deprive him of the option of editing the Draft Responses based on his counsel's

critiques. As long as DOD's counsel is allowed to provide input into the declarations filed in support of its dispositive motion, it cannot reasonably complain about Hopkins's counsel doing the same.

DOD concluded its first discussion of this issue as it began it: with a patently false misrepresentation. DOD cited to an order from another case, describing it as "in prepublication review case, denying the plaintiff's motion to compel the government to provide access to classified information in the middle of summary judgment briefing." (*Id.* (citing *Lawless v. DOD*, No. 21-2859, slip op. (D.D.C. Mar. 6, 2023) [hereinafter *Lawless* Order]).) Contrary to DOD's creative description, that decision bore no resemblance to this description. In *Lawless*, the plaintiff requested access to a "secure stand-alone computer" that that he could "draft a declaration that would specifically refute DoD's classification arguments, while protecting against even the inadvertent disclosure of classified information." *Lawless* Order at 2 (cleaned up), attached as Ex. D.

The district court issued that holding because, in part, the plaintiff stated that he could "take steps to carefully craft a more cryptic declaration that is unclassified," the plaintiff "demonstrated no need for access to a secure computer for now." *Id.* at 4. In other words, the entire question before the *Lawless* court was whether or not the plaintiff could access a secure computer *which contained no classified information* for the purposes of *securely protecting classified information he intended to give to the Court*. This is fundamentally different from DOD's description of "the plaintiff's motion to compel the government to provide access to classified information" (DOD's Stay Opp'n at 9), and the fact that DOD attempted to transparently mischaracterize it as such to preempt Hopkins from presenting a complete case demonstrates DOD's lack of good faith in this litigation.

Once Hopkins filed the first version of this Motion, DOD made additional arguments, many of which were equally frivolous yet are expected to reappear. First, it continued to object, while admitting that it was only contending that *some* of the images of other documents contained allegedly classified information. (Def.'s Opp'n Pl.'s Mot. Auth. His Counsel to Access His Intended Evid., Dkt. #43, at 4 (filed Mar. 4, 2024) (claiming that "the images . . . *either* contain classified information themselves that he cannot republish, *or* would, in context, serve to inform an astute reader of the content of the redacted text in his manuscripts" (emphasis added)) [hereinafter DOD's 1st Opp'n].) The use of the disjunctive "either…or" means that at least some of the images contain no classified information whatsoever. *Cf. Wilcox v. Leapley*, 488 N.W.2d 654, 661 (S.D. 1992) (Sabers, J., concurring) ("I may need more lessons in logic but words like 'disjunctive,' 'either,' and 'alternative' imply one or the other but not both.").

This admission speaks volumes when paired with the inescapable fact that, when given a chance to oppose the previous version of this Motion, DOD did not offer a scintilla of admissible evidence to support its argument. Instead, it relied on the unsupported claims of its counsel, which cannot be considered by the Court. *Jeon v. Holder*, 354 F. App'x 50, 53 (5th Cir. 2009) (statements of counsel are not evidence); *Skyline Corp. v. NLRB*, 613 F.2d 1328, 1337 (5th Cir. 1980) (same). The Court's decision to deem the previous motion moot has given DOD a second chance to support its opposition with admissible evidence, but if it does not, the Court should accordingly hold that DOD has conceded this argument by deliberately failing—by choice—to offer any evidence in support of its claims. *Cepeda v. City of Rockwall*, No. 23-2234, 2024 WL 264688, at *2 n.2 (N.D. Tex. Jan. 24, 2024) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue.") (quoting *Kellam v. Metrocare Servs.*, No. 12-

352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd*, 560 F. App'x 360 (5th Cir. 2014)).

However, the most telling moment in this entire case to date came even later, when DOD finally filed the *Klaxon!* Draft Response with the Court and discussed it. Seventeen months and a successful appeal after DOD promised that it would clearly demonstrate that the *Klaxon!* Draft Response was currently and properly classified as soon as it filed its reply brief in support of its first dispositive motion, DOD filed that brief and discussed the *Klaxon!* Draft Response in *two sentences and a citation*. The full extent of DOD's evidence that it was correct to prevent Hopkins from providing this document to his undersigned counsel was:

> As set forth in the Department's classified supplemental memorandum—submitted for the Court's *in camera* and *ex parte* use only—Dr. Hopkins fails to establish official disclosure of the information that remains redacted. Indeed, while Dr. Hopkins provided screenshots of purported public disclosures in the Rebuttal, Dr. Hopkins' brief makes no attempt to discuss the substantive legal requirements for official disclosure. *See generally* Pl.'s Opp. at 22–29 (providing no legal authority or discussion regarding the substantive requirements for official disclosure).

(Def.'s Comb. Reply Supp. Mot. Dismiss & Summ. J. & Opp'n Pl.'s Mot. Amend Compl., Dkt. #86, at 23 (filed Aug. 8, 2025).)

In other words, as Hopkins predicted (and predicts again herein), DOD chose not to focus on the releasability of the *Klaxon!* Draft Response under the "derived from public sources" test and instead focused entirely on the applicability of the "official disclosure" test to *the manuscripts*. Even more importantly, it did exactly what Hopkins feared: criticizing his undersigned counsel's alleged failure to demonstrate how the information in the *Klaxon!* Draft Response—which *he had not seen*—satisfied that demanding fact-specific test. DOD has now been given two chances to prove that the *Draft Responses*—and not the manuscripts—are not derived from public sources, and it has studiously avoided the question each time. The Court is

now giving DOD a third bite at the apple, but if DOD's opposition falls back on the same flawed arguments as it has made previously, the Court should find that it has conceded the argument and immediately authorize the undersigned to review the Draft Responses and discuss them with Hopkins without fear of reprisal.

## CONCLUSION

This Court should order DOD to provide it with a copy of the *Crowded Skies* Draft Response—*without* an accompanying declaration—and decide for itself whether Hopkins can share all or part of that document or the previously filed *Klaxon!* Draft Response with his undersigned counsel. If the Court agrees that the information is not derived from public sources, it should not grant this Motion. If the Court finds that the question is close, it should authorize its limited release to the undersigned on the condition that he be processed for an LSA and sign an NDA prohibiting further disclosure without the leave of the Court or DOD. This Court is more than capable of determining on its own whether a document comprised of screenshots of publicly available documents—many bearing official declassification markings—was derived from public sources, and it does not need the federal Government whispering the preferred answer in its ear.

Date: November 24, 2026

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
N.D. Tex. Bar #984704DC
National Security Counselors
1451 Rockville Pike
Suite 250
Rockville, MD 20852
501-301-4672
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing filing contains 6435 words.

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.